IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

**CENTENNIAL BANK,**
**Guardian of the Estate of**
**Mary Moore Stiny** **PLAINTIFF**

**v.** **No. 3:17-cv-226-DPM**

**RENA WOOD** **DEFENDANT**

# ORDER

The parties were unable to resolve their disputes about some parts of Paul Tennen's evidentiary deposition. The Court's rulings are noted in the margin on the attached copy of their joint report. The Court is also attaching counsel's letter about the color legend for Tennan's deposition and the color-coded transcript. The Court thanks counsel for their helpful work highlighting the disputed testimony in context. Joint report, *№ 193*, addressed.

So Ordered.

D.P. Marshall Jr.
United States District Judge

5 December 2018

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CENTENNIAL BANK, Guardian of the Estate
of Mary Moore Stiny, an Incapacitated Person

Plaintiff

Vs. No. 3:17-cv-00226 DPM

RENA WOOD

Defendant

**JOINT REPORT ON DEPOSITION DISPUTE**

Comes the Plaintiff, Centennial Bank, Guardian of the Estate of Mary Moore Stiny, by and through its attorneys, Lyons & Cone, P.L.C. and Carla Rogers Nadzam and the Defendant, Rena Wood, by and through her attorneys, Lilly Law Firm, P.A. and the Darvish Law Firm and for their Joint Report on Deposition Dispute, states:

1. That on December 4, 2017, this Court issued its Final Scheduling Order in this matter (Doc. 52).

2. That in its Order, the Court directed the parties to try to agree on deposition testimony and if a dispute or objection was unresolved to file a Joint Report on November 8, 2018.

3. That the parties have conferred and discussed the issues regarding the deposition of Mr. Paul Tennen which was delayed in being provided by the reporter to the parties.

4. That a dispute still remains as to the introduction of the following portions of Mr. Tennen's deposition. Additionally, a brief description of the objections are set forth with the

disputed portions below:

| Page | Lines | Objection | Ruling |
|---|---|---|---|
| 19 | 18-20 | Hearsay | sustained |
| 20 | 1-5 | Hearsay | sustained |
| 27 | 18-21; 23 | Conclusion | overruled |
| 48 | 24-25 | Calls for speculation | overruled |
| 49 | 1-5 | Calls for speculation | overruled |
| 54 | 11-25 | Irrelevant or if relevant, its probative value is outweighed by unfair prejudice | sustained. Irrelevant. |
| 56 | 1-2; 13-20; 24-25 | Irrelevant or if relevant, its probative value is outweighed by unfair prejudice | |
| 58 | 7-25 | Calls for speculation | withdrawn |
| 59 | 10-15 | Irrelevant or if relevant, its probative value is outweighed by unfair prejudice | sustained. Irrelevant |
| 65 | 22-25 | Hearsay | Overruled with instructions: Delete the Question at 65:14-16. The answer at 22-25 is fine as his personal experience. |
| 67 | 22-25 | Hearsay | ~~sustained~~ sustained |
| 68 | 1 | Hearsay | |
| 84 | 18-25 | Confusing, assumes facts not in evidence, lack foundation, calls for speculation, vague as to what "statements" were produce. | overruled |
| 85 | 1-25 | Confusing, assuming facts not in evidence, lack foundation, calls for speculation, vague as to what "records" were produce. | overruled |
| 86 | 1-12;23-25 | Confusing, assuming facts not in evidence, lack foundation, calls for speculation, vague as to what "records" were produce. | overruled |
| 87 | 1, 5-12, 19-25 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |

| | | | |
|---|---|---|---|
| 88 | 1-25 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 89 | 1-17 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 90 | 6-25 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 91 | 1-25 | Irrelevant, orif relevant, their probative value is outweighed by unfair prejudice, calls for speculation, confusing characterization of the source of the checks | overruled |
| 92 | 1-5;13-17 10-25 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 93 | 1-25 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 94 | 1-24 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 95 | 1-6, 17-24 | Document speaks for themselves, irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 96 | 1-10, 16-23 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled |
| 97 | 6-21 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation, hearsay | overruled. Opposing party statement/action. |
| 98 | 1, 3-4,6-9, 13, 15-23 | Conclusion, calls for speculation, vague as to "I did receive documentation | overruled |
| 99 | 1-12;19-23 | Calls for speculation, calls for attorney-client privileged information | overruled. If consultation was privilaged, it was waived by PT's lawyer and the answer. |
| 101 | 6-25 | Calls for speculation, vague | overruled |
| 103 | 6-7;12-16 | Calls for speculation; Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice | overruled |

overruled

| | | | |
|---|---|---|---|
| 106 | 1-25 | Conclusion, calls for speculation; Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice | Overruled |
| 108 | 1-24 | Calls for attorney client privileged information, vague as to "comply with the order" | overruled |
| 109 | 1-9, 12-13, 15-24 | Argumentative, lacks foundation, vague as to "authority" | overruled |
| 111 | 1-11, 20-24 | Calls for attorney-client privileged information, calls for speculation vague as to "obligation for both sets of apartments essentially are the same" | overruled |
| 116 | 13-21 | Calls for speculation; Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice | overruled |
| 120 | 8-9; 14-24 | Calls for speculation; Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | overruled. |
| 122 | 4-6, 8-16, 18-25 | Calls for speculation; Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice | overruled. |
| 129 | 1-25 | Irrelevant, or if relevant, their probative value is outweighed by unfair prejudice, calls for speculation | sustained. |

5. That the parties will attempt, prior to pre-trial, to narrow their dispute in regard to the above.

6. A paper copy of the transcript of Mr. Paul Tennen will be produced to the Court in chambers by FedEx or other overnight service.

Respectfully Submitted,

LYONS & CONE, P.L.C.
P. O. Box 7044
Jonesboro, AR 72403
(870) 972-5440

By: /s/Jim Lyons
    Jim Lyons, State Bar No. 77083
    David D. Tyler, State Bar No. 99154
    jlyons@leclaw.com
    dtyler@leclaw.com
    Attorneys for Plaintiff

/s/ Carla Rogers Nadzam
Carla Rogers Nadzam, State Bar No. 87123
Attorney for Plaintiff
P.O. Box 8013
Jonesboro, AR 72403-8013
crnadzam@nadzamlaw.com
(870) 933-0565

LILLY LAW FIRM, P.A.
P.O. Box 8035
Jonesboro, AR 72403
(870) 935-7320

By: /s/ Martin Lilly
    Martin Lilly, State Bar No. 90098
    marty@lillylawfirm.com
    Attorney for Defendant

DARVISH LAW FIRM, APC
10990 Wilshire Blvd. Ste. 420
Los Angeles, CA 90024
(310) 234-4050

By:/s/ Elan Darvish
Elan Darvish, Cal. Bar No. 223453
Elan@DarvishFirm.com
Attorney for Defendant

**Certificate of Service**

The undersigned attorney hereby certifies that on November 8, 2018, he has caused to be filed the foregoing pleading via electronic CM/ECF filing and whereby notice is to be provided to the following attorneys of record for Defendant and others electronically by the Court using the CM/ECF system or by U.S. Mail for those who are not electronically notified:

Martin E. Lilly
Lilly Law Firm, P.A.
P.O. Box 8035
Jonesboro, AR 72403

Elan Darvish
Darvish Law Firm, APC
10990 Wilshire Blvd. Ste 420
Los Angeles, CA 90024

Carla Rogers Nadzam
Attorney at Law
P.O. Box 8013
Jonesboro, AR 72403-8013

Mark R. Johnson
Attorney at Law
2423-A Hwy 62/412
Hardy, AR 72542

/s/ Jim Lyons
Jim Lyons
Ark. Bar No. 77083
Attorney for Plaintiff
LYONS & CONE, P.L.C.
P. O. Box 7044
Jonesboro, AR 72403
(870) 972-5440
jlyons@leclaw.com

F:\WP60\STINY\Joint.Report.Depo.Dispute.wpd

JIM LYONS**
jlyons@leclaw.com

ANDREW NADZAM
anadzam@leclaw.com

Lyons & Cone, P.L.C.

ATTORNEYS AT LAW
407 SOUTH MAIN
P O BOX 7044
JONESBORO, ARKANSAS 72403-7044
870-972-5440 • FAX: 870-972-1270
WEBSITE: WWW.LECLAW.COM

MIKE CONE*
mikecone@leclaw.com

DAVID TYLER*
dtyler@leclaw.com

*Master of Laws in Agricultural Law
**Keenan Ball Trial College Faculty

November 28, 2018

**VIA OVERNIGHT SERVICE & EMAIL**

Hon. D. P. Marshall, Jr.
United States District Judge
600 West Capitol Avenue, Room B149
Little Rock, AR 72201

Re: Centennial Bank vs. Rena Powell Wood, et al.;
U.S. District Court for the Eastern Dist. of Ark.;
Case No. 3:17-cv-00226-DPM

Dear Judge Marshall:

Per your request at the Pretrial Hearing, enclosed please find a color copy of the Deposition of Paul Tennen (the "Deposition") which include the designations by Plaintiff and Defendant as well as the objections to the designations by the Plaintiff and Defendant. Additionally, enclosed please find the Joint Report on Deposition Dispute which sets out the objections to the designations.

The color legends for the designations and objections in the Deposition are as follows: (i) Yellow is Plaintiff's designations; (ii) Green is Defendant's designations; and (iii) Orange is the objections for both parties and with each objection in the margin the objecting party is noted as "Obj. Plaintiff or Obj. Pltf." for the Plaintiff or "Obj. Def." for Defendant. Additionally, please note that in some cases, the Defendant designated and objected to the same portions of the Deposition. Finally, as this was an evidentiary deposition, any objection which was raised in the Joint Report on Deposition Dispute but was not set forth in the deposition should be disregarded.

By carbon copy, I am providing other counsel with notice of this communication with you as well as the enclosures. If there are any questions, please contact me. Thank you.

Sincerely,

Jim Lyons

JL/ab

Enclosures

cc:    Carla Nadzam via email (w/enc.)
        Mark Johnson via email (w/enc.)
        Marty Lilly via email (w/enc.)
        Elan Darvish via email (w/enc.)

F:\WP60\STINY\Judge Marshall3.ltr.wpd

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| CENTENNIAL BANK, Guardian of the Estate of Mary Moore Stiny, an Incapacitated Person,<br><br>Plaintiff,<br><br>vs.<br><br>RENA WOOD,<br><br>Defendants. | ) | Case No.: 3:17-cv-00226 DPM |

DEPOSITION OF PAUL TENNEN

LOS ANGELES, CALIFORNIA

THURSDAY, OCTOBER 18, 2018

REPORTED BY: KIMBERLY M. LOWE
CSR NO. 12529

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CENTENNIAL BANK, Guardian of the Estate of Mary Moore Stiny, an Incapacitated Person,

Plaintiff,

vs.

RENA WOOD,

Defendants.

Case No.: 3:17-cv-00226 DPM

VIDEOTAPED DEPOSITION OF PAUL TENNEN, taken on behalf of the Defendants, at 10990 Wilshire Boulevard, Suite 420, Los Angeles, California beginning at 10:59 a.m., and ending at 4:26 p.m. on Thursday, October 18, 2018, before Kimberly M. Lowe, Certified Shorthand Reporter No. 12529.

APPEARANCES:

FOR THE PLAINTIFF:

LYONS & CONE, P.L.C.
BY: JIM LYONS, ESQ.
407 South Main Street
Jonesboro, Arkansas 72403
870.972.5440
jlyons@leclaw.com

FOR THE DEFENDANT:

THE DARVISH FIRM, APC
BY: ELAN DARVISH, ESQ.
DAVID WONG, ESQ.
10990 Wilshire Boulevard
Suite 420
Los Angeles, California 90024
310.234.4050
elan@darvishfirm.com

FOR THE WITNESS:

LIBERTY BELL LAW GROUP
BY: M DAVID MILLER, ESQ.
20350 Ventura Boulevard
Suite 230
Woodland Hills, California 91364
818.556.1515
davemiller@libertybelllaw.com

ALSO PRESENT:

LON ANDRE, VIDEOGRAPHER

I N D E X

| WITNESS: | PAGE: |
|---|---|
| PAUL TENNEN | |
| Examination by Mr. Darvish | 7, 124 |
| Afternoon Recess | 73 |
| Examination by Mr. Lyons | 84, 114 |

E X H I B I T S

| PLAINTIFF'S: | | PAGE: |
|---|---|---|
| Exhibit 1 - | Bank of America Statement 4/1/13 Through 4/30/13 | 87 |
| Exhibit 2 - | 2/8/16 Letter to Mr. Tennen Re: Guardianship of the Estate of Mary Moore Stiny | 105 |
| Exhibit 3 - | 2/8/16 Letter to Mr. Tennen Re: 555 East Olive Avenue & 321 South Sixth Street | 107 |

| DEFENDANTS': | | PAGE: |
|---|---|---|
| Exhibit 1 - | Subpoena to Testify at Deposition in a Civil Action | 12 |
| Exhibit 2 - | List of Documents Produced | 14 |
| Exhibit 3 - | Subpoena to Testify at a Deposition in a Civil Action | 42 |
| Exhibit 4 - | Durable Power of Attorney for Asset Management | 55 |

I N D E X (Continued)

| DEFENDANTS': | | PAGE: |
|---|---|---|
| Exhibit 5 - | Uniform Statutory Form Power of Attorney | 57 |
| Exhibit 6 - | 2/2/11 Letter Re: Delegation Of Management Duties | 60 |
| Exhibit 7 - | Quitclaim Deed | 62 |
| Exhibit 8 - | Quitclaim Deed | 63 |
| Exhibit 9 - | Asset Allocation Agreement Stiny Family Trust | 68 |
| Exhibit 10 - | Amendment to Petition for Order Approving Division of Trust Into Two or More Separate Trusts | 82 |

QUESTIONS INSTRUCTED:

(NONE)

INFORMATION REQUESTED:

(NONE)

LOS ANGELES, CALIFORNIA
THURSDAY, OCTOBER 18, 2018; 10:59 A.M.

(Prior to going on record, all parties stipulated to waive the reading of Federal Rule 30(b)(6) read-on by the reporter.)

**THE VIDEOGRAPHER:** We are going on record. The time is 10:59 a.m. on October 18, 2018.

This is media one of the video deposition of Paul Tennen taken by the defendant in the matter of "Centennial Bank, Guardian of the Estate of Mary Stiny versus Rena Wood," filed in the United States District Court, Eastern District of Arkansas, Civil Action No. 317-cv-00226.

This deposition is being held at 10990 Wilshire Boulevard, Suite 420, Los Angeles, California.

My name is Lan Andre representing L.A. Reporters with offices located in Los Angeles, California; and I am a certified videographer.

The court reporter is Kimberly Lowe from the firm L.A. Reporters with offices in Los Angeles, California.

Counsel will now state their appearances and affiliation for the record.

**MR. DARVISH:** Elan Darvish appearing on behalf of Defendant Rena Wood.

**MR. MILLER:** Dave Miller appearing -- representing the Deponent Paul Tennen.

**MR. LYONS:** Jim Lyons on behalf of Plaintiff Centennial Bank.

**MR. WONG:** David Wong on behalf of Defendant Rena Wood.

**THE VIDEOGRAPHER:** Will the court reporter please swear in the witness.

PAUL TENNEN,
having been first duly sworn by the reporter,
was examined and testified as follows:

**EXAMINATION**

**BY MR. DARVISH:**

Q. Good morning, Mr. Tennen. My name is Elan Darvish, and I am the attorney for Defendant Rena Wood.

You're here today as a result of a subpoena that was issued. The purpose of this deposition is to be used in lieu of live testimony at trial in the case titled "Centennial Bank versus Rena Wood" in federal court, located in the Eastern District

of Arkansas, Case Number 13:17-CV-00226.

During the deposition, I'm going to be asking you a series of questions which will be used in trial in this case. As you heard earlier, your testimony here today is going to be under penalty of perjury. It's going to have the same force -- your actual oath that you made has the same force and effect as you would normally have in trial in a courtroom.

If you don't answer -- if you don't understand a question that I am asking, please ask me to repeat it. Please don't answer if you don't understand the question.

If you do understand the question, we presume -- and you do answer it, we presume that you understood the question.

Everything that we're saying here today, even though we have a videographer, we also have a court reporter who is transcribing everything that's being said, which means that she's only able to type one of us speaking every time. So if I'm asking a question, please just do me a favor and wait until I finish the question before responding.

Every question I ask, I ask that you give me verbal responses, which means that with "yes" or "no" or actual words. The court reporter,

unfortunately, cannot transcribe "uh-huhs" or "huh-uh's. So when asked a question, it would have to be a verbal response.

One thing I'd like you to do, if I ask you a question, is not guess. Normally, I go through this. In every single deposition, attorneys use completely different examples to explain what the difference is between a guess and an estimate.

I'm entitled to estimates, but I do not want you to guess. So the difference between an example would be is if I ask you what the size of my garage was at home, you would pretty much have to guess because you've never been to my home. You could never tell me how big my garage is.

However, if I ask you what the square footage of this room is, you'll be -- in relatively certainty be able to give me an estimate as to how big this room is.

Do you understand the deposition?

**A. I do.**

Q. At the end of the deposition the court reporter will prepare a transcript, and that transcript is going to be sent to you. What we would like you to do is read it and verify that you answered each one of the questions correctly. You could make changes with

regards to the transcript itself, but if you make any changes, we would be able to make a note of those changes at trial.

Therefore, I always tell deponents to try to answer to the best of your knowledge right now.

Had -- do you understand everything that we have discussed so far?

**A. I do.**

Q. Have you had any alcohol in the past 24 hours?

**A. I have not.**

Q. Okay. Are you taking any medication that impairs your ability to understand questions or answer truthfully?

**A. No.**

Q. Is there any reason that you feel you cannot move forward with the deposition here today?

**A. No.**

Q. Can you please state your name for the record.

**A. Paul Steven Tennen.**

Q. And what is your address?

**A. My business address is 3699 Wilshire Boulevard, Suite 800, Los Angeles, California 90010.**

Q. Okay. And what is your home address?

**A. 940 South Cloverdale Avenue, Los Angeles, California 90036.**

Q. What is your occupation?

**A. Real estate property manager.**

Q. And how long have you been doing that?

**A. I bought the company, Linder & Associates, in 2012. So I've owned the company since then; however, I've been a real estate agent and a property manager prior to that; so I would say maybe, you know, eight -- eight years total.**

Q. Okay. And what is your position right now at Linder & Associates?

**A. I'm the president of the company.**

Q. Do you know -- are you familiar with the Stiny Family Trust?

**A. I am.**

Q. How are you familiar with them?

**A. We work on behalf of them for the management of the properties that we manage.**

Q. Do you know the addresses to the properties that you manage for them?

**A. 555 East Olive Avenue, Burbank, California. I don't know the ZIP Code offhand. 321 South Sixth Street, Burbank, California. I believe it's 91423, but I'm not correct on that.**

Q. Okay. You manage these properties; correct?

**A. I do.**

Q. And how long have you been managing them for?

**A. Since 2013.**

Q. Do you have a signed written agreement with -- to manage these properties?

**A. I do.**

Q. Okay. Perfect.

I am showing you what has now been pre-marked as Exhibit 1.

(Whereupon, Defendant's Exhibit No. 1 was marked for identification by the reporter and is attached hereto.)

**BY MR. DARVISH:**

Q. Can you take a look at that document for me.

**A. Yes, sir.**

Q. Did I give you the original?

**MR. LYONS:** This has the original sticker on it.

**MR. DARVISH:** Let me trade you out.

**MR. LYONS:** Okay.

///

**BY MR. DARVISH:**

Q. Do you know what this document is?

**A. This is a property management agreement.**

Q. Okay. Who's the property management agreement with?

**A. Stiny Trust and Linder & Associates, R.E.S.U.**

Q. Okay. And are you familiar with this document?

**A. Yes, I am.**

Q. And can you look at the -- the second page of the document.

Was this an agreement that was signed on behalf of the Stiny Trust?

**A. Yes, it was.**

Q. Do you recall when this agreement was signed?

**A. I cannot tell you the exact date. However, I believe it would have been March 18, 2013, as I, you know, put that date in as our agreement date and when I did this in person. So that would -- I guess you could say that's my best guess.**

Q. Okay.

**A. But --**

Q. Did you see Rena Wood sign the document?
A. Yes, I did.
Q. And you were present at that time?
A. Yes, I was.
Q. All right. I am showing you what has not been pre-marked as Exhibit Number 2.
(Whereupon, Defendant's Exhibit No. 2 was marked for identification by the reporter and is attached hereto.)
BY MR. DARVISH:
Q. Can you tell me what this document is.
A. Exhibit No. 2 is a property management agreement.
Q. Is it -- for which property?
A. It would be for 3563 East Verdugo Avenue and also 321 South Sixth Street, which is one property at the corner.
Q. And they're both similar agreements?
A. They are.
Q. And for two different properties?
A. Correct.
Q. Okay. Were you also present when Ms. Wood signed this agreement?
A. I was.

Q. Do you have a copy of this agreement in your file currently?
A. We do.
Q. Do you -- who has management control of all the records for Linder & Associates?
A. That would be me.
Q. Would you be custodian of records for Linder & Associates?
A. I would.
Q. And this would be part of your file?
A. That is correct.
Q. Is there any reason to believe that these two documents that I've just shown you, Exhibits 1 and 2, are not the true and correct copies of the documents that Ms. Wood signed?
A. I do not have any reason to believe that.
Q. All right. With regard to the agreement itself -- I'd like you to take a look at the agreement, both of them.
Who's this agreement with?
A. Well, the first one with Olive is the Stiny Trust. The second one is the -- I'm sorry -- Exhibit 2 is the Elijah and Mary Stiny Trust.
Q. They're both with a trust; correct?

A. That's correct.
Q. What was your understanding as to who owns the properties?
A. My understanding is that the trust owns the properties. I was the one who generated these management agreements, and I went to Fidelity Title's Web site to pull down the ownership statement.
The reason for the difference is because there is an abbreviation in one, and the way it's written -- you know, basically online, the title is written differently for each of the ones.
See it's abbreviated, Stiny Trust, comma, Elijah and Mary Stiny Trust. So then the second one that I did was basically I wrote it out, but this was based off of Fidelity National Title online Web portal for trust -- you know, for property profiles.
Q. I presume it's what you call "Title Pro" is what you're looking at?
A. Yes.
Q. When you pulled up "Title Pro," did you pull up the deed or did you pull --
THE REPORTER: I'm sorry.
(Speaking simultaneously.)
THE WITNESS: I did not pull up her deed.

BY MR. DARVISH:
Q. So when you went to -- I believe it's called Title Pro 24/7.
A. Yes.
Q. And so when you went on line, you looked at the cover page?
A. Correct.
Q. Do you have any other agreements with either the Stiny Trust or Elijah and Mary Stiny Trust?
A. I do not.
Q. And earlier I believe you testified that your understanding was that the trust owned these properties; correct?
A. That is correct.
Q. All right. Do you know who Rena Powell is?
A. I do.
Q. Do you know her as Rena Powell, or did you know her as another name?
A. I know -- I know her as Rena Powell. I know her as Rena Powell Wood.
Q. So when I refer to "Rena," I'm referring to "Rena Powell Wood."
A. Yes. I believe Paul is her maiden name.

Q. And how do you know her?
A. She contacted us, my management company, to manage her properties.
Q. When you say "manage her properties," did she own the properties?
A. No.
Q. Did she ever tell you she owned the properties?
A. She did not.
Q. What did she tell you with regard to what authority she had with regard to the properties?
A. She's working on behalf of the trust.
Q. Okay. And how did you know that?
A. She provided a document that she was a co-trustee of the trust.
Q. Do you have that document?
A. I do.
Q. Okay. When was the first time that you met with Rena?
A. I cannot tell you that. I do not remember exactly when.
Q. Would it be -- would it be safe, so to say, obviously, prior to --
A. That is correct.
Q. -- Exhibit 1 -- Exhibit 1 and 2 being

signed; correct?
A. That is correct.
Q. How far before you believe that before Exhibits 1 and 2 were executed that you met with her?
A. Maybe a month.
Q. Okay. And what role did she have in terms of over the years with regard to the management of the apartments?
MR. LYONS: Objection. Calls for hearsay.
MR. MILLER: You can answer if you know.
THE WITNESS: Please repeat the question.
BY MR. DARVISH:
Q. You are so -- what role did she have -- maybe I should clarify.
What role do you believe she had by interacting with her with regard to the management of the company?
MR. LYONS: Same objection.
MR. MILLER: You can answer based on your personal knowledge only.
BY MR. DARVISH:
Q. Correct.

A. My understanding is that she was acting as an agent on behalf of the trust as a co-trustee, as she had described, and that she had the authority to engage us and sign a management agreement with us as most of my clients do.
MR. LYONS: Same objection. I'll ask it be stricken. He said it was based on -- essentially said it was based on what she told him.
BY MR. DARVISH:
Q. Did you regularly interact with Rena Wood after you signed -- after you had her execute Exhibits 1 and 2?
A. Yes.
Q. How often would you interact -- communicate with her?
A. I cannot recall the frequency, but I can tell you that, upon execution of the document, we began to do our normal takeover of a property, which included both the transition of paperwork and some gathering of information and some general, you know, interactions towards getting a handle on the management of these buildings.
Q. Did she assist you in the transition paperwork and getting ahold of the management of the two buildings?

A. Yes, she did.
Q. Could you describe, after the agreements were signed, what sorts of communications that you had with her?
A. She had provided us some, you know, paperwork for, I believe -- I guess, operational of the building, her records that she had of prior operations of the building months prior. She had given me the contact information for the resident manager. She had provided us with information with regard to the bank account that we're going to be working with, and I -- I believe -- and I cannot recall specifically that we received a keys from her. But typically, we would have gotten keys from the -- from her.
You know, I can't -- I just can't recall if it was, like, given from the resident manager at the time or given by her, but she gave us common area keys basically, and the resident manager typically has a set of keys for the tenant units.
But, unfortunately, it's hard to recall specifics; but that was our interactions through that period of time until I was strong enough to get ahold of the operations of the building, and we began to get going.
Q. Perfect.

Page 22

So I presume that that occurred in about 2013 when the agreement was signed; correct?
A. That is correct.
Q. Okay. After you started getting going and 14 came along, were you still having interactions with Ms. Wood?
A. Yes.
Q. What kind of interaction would you have?
A. Both e-mail correspondence calls on the phone, and there were, I believe, at least one to three physical interactions at the building. I cannot recall the amount of frequency. But there were interactions at the buildings. We did a walkthrough of the premises.
Q. How often?
A. I cannot recall specifically how often, but I do recall we had -- there is at least one interaction that I had with her where I do recall being at the buildings with her, and we did a walkthrough of the common areas.
I cannot confirm that beyond that initial one -- I know that subsequently we had -- over the years we had several, but initially, I could only remember specifically one, but it could have been maybe two or more. I just cannot remember.

Page 23

Q. When you're talking about one or two, what kind of time frame are you referring to?
A. Within the following month or so of the signing of this agreement --
Q. So we're talking about 2013?
A. Oh, yeah.
Q. Okay. We're talking about 2013?
A. That's correct.
Q. I wanted -- so you had subsequent walkthroughs with her in 2014 and '15?
A. Yeah, there was at least one meeting. I could tell you at least in '14 there was at least one meeting where we would -- you know, she would fly in and meet at the property and we would walk the buildings or at least talk outside.
Initially, when we first took over, she was in L.A.; And she and I had spoken relatively frequently just because I needed to get a bunch of information from her.
Q. Okay.
A. So for my accounting purposes for -- and I don't have specifics but that -- you know, I know there was interactions related to that.
Q. So in '14, these conversations -- these conversations were occurring over telephone and e-mail?

Page 24

A. They were mostly on telephone and e-mail; however, if you're specifically relating to 2014, yes. There were physical interactions at the property. I just cannot remember how many.
Q. Okay.
A. But I do know that we at least had at least one a year since this time. I just cannot recall specifically how much more in '14 or '15 has it dissipated. She was initially in town when this started. So it was easier to do that. That's why I believe the frequency was a little bit higher at the end of '13. By "higher," I mean maybe two or three times, perhaps. But beyond that, our interaction was an e-mail and phone.
Q. Do you recall interactions in -- we talked about '13, '14, and '15.
What about '16?
A. Honestly, I cannot recall specifically that year.
Q. Okay.
A. But I could tell you that we did have physical interactions at the building to do walkthroughs, to point things out, to show me things to paint. It certainly dissipated as the years went on because she moved to a different part of town or

Page 25

different part of the country. But initially, you know, there was a buildup to that. So there were a few interactions, and then it kind of dissipated. It was more of the things we could call an e-mail.
Q. So when she would come to meet you at the property, she would do a walkthrough?
A. Uh-huh.
Q. What would you discuss with her?
A. Initially, we talked about things that she wanted to better at the building; so there was a room that we converted into a gym, per her direction, because she wanted a rec room for the tenants.
There was paintings -- elements of paintings that were needed around the building. There were conversations about the --
MR. LYONS: Object to conversation as hearsay.
THE WITNESS: Okay.
BY MR. DARVISH:
Q. Keep on going.
A. About the improvement of the bricks, which were fading in color and calcium buildup. There was conversation about the improvement of the look of the pools because they were in need of some improvement both with furniture and also, I guess, paint and some

tile -- you know, there were cracks in the plaster, that kind of conversation. So there was -- there were conversations about that needed, yeah.

Q. What would be your opinion as to the -- you're a real estate agent; correct?

A. Yes.

Q. And how long have you had your license?

A. Let's see. I -- I was licensed, I believe, in 2003 -- 2000 -- I got my license in '3.

Q. Okay.

A. I have a broker. I was a real estate agent from basically 2004 through current.

Q. Okay.

A. I became a broker in -- I cannot recall the exact day. It was 2000 -- last -- probably 2014.

Q. Okay.

A. But I'm not confirmed on that date, but I've basically been -- I was a real estate agent for a while. During that period of time, I had been approached by clients, not this client but others, to manage their buildings. So over time, I began to manage other client buildings.

And then I did do -- and then in 2012 I met a David Linder. David Linder owned a company, management company, that we wanted to expand our

operations. So we purchased this company in itself. I purchased this company in 2012, and then in the early part of '13 is how we met Rena. My company, me and her met; and that's kind of the length of time.

Q. Okay. And where did you go to school?

A. I went to college at USC.

Q. Okay.

A. University of Southern California.

Q. And what was your bachelor's in?

A. I have a bachelor's in economics.

Q. Okay.

A. And a minor in music industry.

Q. And did you go to school after that?

A. I did not.

Q. Okay.

A. I did get my real estate license after college.

Q. In your opinion, would you believe that the improvements that were made on the property that were directed by Rena improved the value of the property?

MR. LYONS: Object.

THE WITNESS: 100 percent.

MR. LYONS: Conclusion.

MR. DARVISH: I don't know if you got

bj
tf.

that or not.

MR. MILLER: You can answer.

BY MR. DARVISH:

Q. You can answer the question.

A. I'm fully confident that that improved the property.

Q. And the improvements that were -- I was referring to, so we have a clear record, you testified were the walkthroughs that you did with her with regard to the gym, the painting of the bricks, all the other list of improvements that you earlier testified to; correct?

A. Yes.

Q. Do you know if Rena paid for any type of office expenses or supplies for the operation of the apartments?

A. Not directly. What happened is that we served in notice to the property for -- to the tenants to let them know where to send their rents to our address with -- made out to Linder & Associates, which is the blank -- well, actually, sorry. I do not recall exactly how that was set up initially.

Q. I don't think you understood the question. I apologize.

A. Okay.

Q. The question was do you know if Rena paid for any type of office expenses or any type of expenses with relating to the property itself out of the trust?

A. No.

Q. Okay.

A. The short answer is no.

Q. The operational expenses were paid by Linder & Associates?

A. Were paid by the property --

Q. Correct.

A. -- Via us. So any costs that are related to the property are paid through the property's operation.

Q. Did Rena ever sign any checks, if you recall?

A. I do not believe she did.

Q. So I'd like to kind of go back with regard to the improvements that have been made since.

MR. MILLER: Can I get some clarification on the last question?

MR. DARVISH: Sure.

MR. MILLER: Signing the checks from what account? What were you trying to --

MR. DARVISH: I guess the question is

Page 30

has he seen any checks signed with Rena Wood's signature on them.

MR. MILLER: From?

MR. DARVISH: Anywhere.

MR. MILLER: Out of money that he received from the rents?

MR. DARVISH: Anywhere.

MR. MILLER: Okay. You can answer the question.

BY MR. DARVISH:

Q. Have you ever seen her name signed on any checks?

A. **I don't recall.**

Q. So let's go back to the improvements. I'd like you to outline each one of the improvements that have been made on the property since you took it over.

So you said, I believe, replastering the pools.

A. **Well, if I may back it up a little bit --**

Q. Sure.

A. **-- to give you some perspective on how the process began.**

Q. Okay.

Page 31

A. **The first problem that was there was that the resident manager had been managing the building through the -- I guess the trust under -- I guess.**

MR. LYONS: Object. This is all hearsay.

THE WITNESS: Okay.

MR. MILLER: And, Paul, clarify which building. There are two buildings; correct?

THE WITNESS: So there was one resident manager who managed both properties.

BY MR. DARVISH:

Q. And how do you know that?

A. **Because I met him.**

Q. Okay.

A. **And I do not recall his name offhand.**

Q. Okay. And just to shorten the length of the deposition, I just wanted to know, really, what improvements have been made.

A. **Okay.**

Q. That's all I really need --

A. **I just have a story to tell.**

Q. I know you do, and that's fine. I just need to know what improvements have been made since you took over.

A. **Sure.**

Page 32

Q. Improvements that have been made on the property itself because it sounds like, to me, there's been some significant improvements.

A. **That's correct. We'll start with improvement -- this is in no particular order.**

Q. . Correct.

A. **But purchasing of pool -- brand new pool, you know, chairs and tables to beautify the pool area. We replastered both pools, repaired the pool gates. We installed fitness equipment in both buildings in a common area room tenants can now use as an amenity.**

**We have dramatically improved the unit turnovers so, when a unit becomes vacant, we have dramatically improved the overall look of the units which has contributed significantly to a higher increase in rent value.**

**We have the landscaper replace all common area plants with, I guess -- what do you call it? Dry -- no, water need --**

Q. Drought tolerance.

A. **Drought tolerance plants. Forgive me. We performed decking repairs as needed. We repaired common area gate locks and gate doors. And what I mean by that are hinges and basically to better improve the condition of the gate that's around the building.**

Page 33

**We have repaired or replaced multiple air conditioning units as needed. We reglazed the bricks so the majority of the first floor at both buildings is a brick floor. So it's a big part of the overall look of the building; so those are looking much better now.**

**We put a management sign out front so tenants can now know who to call for vacancies and also emergencies. We performed repairs of exterior lighting. We spent a good deal of time repairing and improving the elevators at both of the properties as they needed both upgrading and also compliance requirement repairs.**

**We cleared the -- repaired the downspouts which were in disarray and needed clearance in both repairs, I guess you could say.**

Q. Okay.

A. **And that's common-area related.**

Q. Okay. And did Rena assist you with regard to these issues?

A. **Yes, both direction and also guidance.**

Q. Okay. Have you ever met Ms. Stiny?

A. **I have not.**

Q. Do you know who Ms. Stiny is?

A. **I have not met her.**

Q. Okay. Have you ever spoken to her on

the phone?
A. I do not believe I have.
Q. And I -- again, Mr. Stiny, have you ever met Mr. Stiny?
A. I have not.
Q. Let's go back to 2013, which is when you scouted the contracts.
What was the procedure on handling the income that was coming in from the rents?
A. So I'm going to try to remember that far back.
MR. LYONS: I object to the question.
Are you talking about before or after Mr. Tennen took over?
BY MR. DARVISH:
Q. I said I believe my question was right after he signed the contract.
MR. LYONS: Okay. Okay. I misunderstood.
THE WITNESS: There -- from what I recall, this is what I recall is that, initially, she was -- the checks were going into an account called Park Verdugo Apartments. We had served notice for tenants to change that.
What I'm struggling to remember at this

moment is, you know, how that was directed to them. And so I'm just blanking on --
BY MR. DARVISH:
Q. Let me clarify the question for you.
I'm a tenant in Park -- Park Verdugo, and I hand you my rent check for April of 2013.
What do you do with that rent check?
A. The rent check, I believe, was deposited into the Park Verdugo -- our bank account was set up --
Q. Okay.
A. -- through the bank that we were banking with.
Q. And what bank was that?
A. It was California Bank and Trust, I believe. I'm just blanking on the process. I have to look back in my notes.
But the reason is -- typically what we do is we have them make the check out to Linder & Associates. We open up a bank account -- a trust account. We put the monies into the account, and we pay the bills from that account.
Q. Is that what you currently do?
A. That is what we currently do. So all the accounts that we have are with a trust account at a

bank, Chase Bank. It was moved over from California Bank and Trust. That's why I'm a little bit unclear here because this was dating back to when we were still with that bank; so --
But from what I recall, there were accounts set up on a trust account that was set up by us. The monies went into that account. From that account, we sent -- well, we would pay the bills, and then any distributions would go to Rena. And Park Verdugo Apartments was what was on the checks. That's what I remember.
Q. So when you say that you wrote the check to Rena to go to Park Verdugo Apartments --
A. They were sent to her address, and they were made out to Park Verdugo Apartment. That was the count she set up as an operational account. That was the account that was in effect prior to us coming on board.
Q. All right.
A. So what I recall we did, as we normally do, is we set up these accounts, two separate accounts. And we put the monies into those accounts that came from the rents, and we would pay the bills because we had the jurisdiction to do that from that account, and then at the end of the account -- the end of the month, as we

normally do, we would send any potential distributions. If we have, we would distribute them.
Q. Would you make the improvements from the costs in the bank account that you have from the trust account?
A. That is correct.
Q. Did you use an outside accounting firm to reconcile your accounts, or did you do those in-house?
A. We reconciled our accounts in-house with my CFO.
Q. And who is your CFO?
A. Don Allay (spelled phonetically.)
Q. How often do you reconcile your accounts?
A. I cannot speak to that offhand. I do not know exactly. I know that monthly, we reconcile all amounts prior to sending out the monthly statements to the clients.
Q. Okay.
A. So I would assume, if not at least once a month, but prior to that it could be more.
Q. So at some point -- so I'm clear on your testimony is that should the tenants -- the tenants would issue a check at the beginning when you entered

into the agreement. They went directly into the Park Verdugo Apartment account. You sent them notices that the checks need to be made directly to Linder & Associates.

A. **If I may.**

Q. Please.

A. **The resident manager who lives there and worked there previously, from what I understand to be true, is he would collect --**

**MR. LYONS:** Object to hearsay.

**THE WITNESS:** He would collect the rents.

**BY MR. DARVISH:**

Q. And how would you know that he collected the rents?

A. **Because that was his practice. That was part of his, I guess, job at the time, the tenants.**

**MR. LYONS:** Same objection.

**THE WITNESS:** He would walk around the building collecting rents and deposited them into the account.

**BY MR. DARVISH:**

Q. Have you -- have you seen him do that before?

A. **No, I have not.**

Q. Did someone tell you that?

A. **That is what I -- I mean, that's what I recall understanding, but I could -- I'm not a hundred percent sure about that.**

Q. You're guessing?

**MR. LYONS:** Motion to strike. Hearsay.

**BY MR. DARVISH:**

Q. What I'm trying to clarify is at some point you took over. You sent notices to everyone in all the units.

A. **Uh-huh.**

Q. The checks came directly to the lenders -- Linder & Associates?

A. **Uh-huh.**

Q. They went to your client's trust account --

A. **Correct.**

Q. -- correct?

And then from the client's trust account, you would pay all the expenses. You pay all the improvements.

A. **Right.**

Q. And then any money left would be distributions that you make to the client?

A. **That is correct.**

**And to clarify, any monies left there's -- sometimes there's reserves for taxes, insurance, and so forth. So it would not necessarily be a total clearing of the account.**

Q. Sure.

A. **We set up the account to pay insurance and also maintenance improvements and things of that nature.**

Q. To your knowledge, was there a mortgage?

A. **I cannot recall offhand.**

Q. Okay. So on this trust account that you're referring to, was Ms. -- Ms. Stiny was not -- strike that.

So on the account that you're referring to, the trust account, Ms. Wood was not a signatory to that account; correct?

A. **Correct.**

Q. Did you send monthly statements with regard to the account to anyone?

A. **Yes. Yes, I did.**

Q. Okay. Who did you send them to?

A. **We would send one to Rena, and we would send one to Mrs. Stiny.**

Q. And where is your understanding

Ms. Stiny lived?

A. **I was given direction by Rena to send a copy to the address we have on file. I can look through my notes and tell you more specifically. I just don't have it in front of me here.**

Q. It's not a problem.

A. **But I was given direction to send two reports monthly.**

Q. The same exact report?

A. **That is correct.**

Q. One to Rena and one to Ms. Stiny?

A. **That is correct.**

Q. Was the address, do you recall, the address of the report that you sent to Ms. Stiny in Arkansas?

A. **I cannot confirm because there was another address involved. I just can't confirm offhand. I'm sorry, but I believe so. I just can't be --**

Q. Okay.

A. **I can pull my records here if it helps, but --**

Q. Did you bring any documents with you today?

A. **I did.**

Q. What documents did you bring with you?

A. **I have all of my documents that I -- are in my files, both operational building documents and my documents related to this case and just --**

Q. Have you provided a copy of all those files to anyone?

A. **Offhand, I do not believe I did.**

**MR. MILLER:** Just to point out, the subpoena does not have a demand for production on the subpoena I've seen.

**MR. DARVISH:** What exhibit number are we on?

**THE REPORTER:** 3.

**BY MR. DARVISH:**

Q. I'm showing you what we've now -- been previously marked as Exhibit No. 4.

**MR. MILLER:** No, we're --

**THE REPORTER:** We're on 3.

**MR. MILLER:** We're 3.

**MR. DARVISH:** 3.

(Whereupon, Defendant's Exhibit No. 3 was marked for identification by the reporter and is attached hereto.)

**BY MR. DARVISH:**

Q. Can you take a look at that document for me.

A. **Yes.**

Q. What is this document?

A. **This is a subpoena to testify at deposition in a civil action.**

Q. Okay. You agreed to appear here today pursuant to this; correct?

A. **Correct.**

Q. Have you been served with another subpoena besides this one?

A. **I have to look -- I have to look back in my files.**

Q. Within the past two weeks has anybody --

A. **Oh, no, not in the past two weeks.**

Q. So you have not been served with a subpoena at all besides this subpoena right here?

A. **That is correct. However, if I may, prior to you coming on board --**

Q. Okay.

A. **-- there was interactions, and I just cannot recall specifically what documents I received at that time because I know you've been sending some, Mr. Lyons.**

**So what I mean to say is I have to look back and see specifically what other documents I have in**

**my files.**

Q. Uh-huh.

A. **But from the time that you have been involved in this case, I have not received anything else.**

Q. Okay. So in the past two to three weeks, you have not been served with another subpoena besides this one, Exhibit No. 3?

A. **That is my recollection.**

Q. Yeah.

A. **Is that your recollection?**

Q. Again, I did not serve you with another subpoena.

A. **Okay.**

Q. I believe that Mr. Lyons issued another subpoena, but presumably, it was not served.

**MR. LYONS:** No, it was served.

**MR. DARVISH:** He was served?

**MR. LYONS:** Yes.

**THE WITNESS:** Okay. That's why -- within the last two weeks?

**MR. LYONS:** I don't know if it was in the last two weeks. In the last three weeks probably.

**THE WITNESS:** Oh, okay. If I could pull my records, I can --

**MR. LYONS:** Personal service on 10-3-18.

**MR. DARVISH:** Let me see that.

(Document handed to counsel.)

(Document reviewed by counsel.)

**BY MR. DARVISH:**

Q. How long have you been sending what I would call dual statements, one to Ms. Wood and one to Ms. Stiny?

A. **I believe since the beginning of our management agreement tenure.**

Q. So you manage the company -- manage the two buildings for a couple of years, and you were distributing that income. At some point you stopped making distributions.

What happened?

A. **We had received conflicting reports from Helen Robins who was the -- I believe, the aunt. I received multiple communications from multiple party members in Arkansas, and I guess it was -- they live in Arkansas. I don't know for sure, but it was the -- I believe it was the nephew, and I believe it was Helen Robins, the aunt. I cannot confirm specifically who was in relationship, but that was who they appeared to be.**

**If I saw the names, I could tell you specifically that they're confirmed that those were the people.**
Q. Do you recall how many conversations -- did you have any conversations with Helen Robins?
A. **I did.**
Q. Okay. How many conversations did you have?
A. **About two to three.**
**MR. DARVISH:** Let's go ahead and take -- go off the record.
**THE VIDEOGRAPHER:** The time is 11:53 a.m. We're off the record.
(Recess taken.)
**THE VIDEOGRAPHER:** The time is 12:03 p.m. We're back on the record.
**BY MR. DARVISH:**
Q. Sir, we're back on record.
At some point you stopped making distributions through the bank account.
A. **Yes.**
Q. Can you tell me why?
A. **We had received conflicting communications that Rena was no longer in charge of or -- of the trust; that Helen Robins had received**

**control back, and therefore, monies should start going to her.**
**And I said, "Well, I'd like to get communication and some sort of proof, if that's the case. And in order -- before I do that or before I continue sending distributions of any kind, I'm going to pause on that."**
Q. All right. Let's try to go into detail.
So how many times did you have conversations with Helen Robins?
A. **You know, there were -- I cannot recall the exact number of conversations. There were at least a few conversations that she called me --**
Q. Okay.
A. **-- saying first -- the first one was to introduce herself just to say hi and, you know, tell me that she was, you know --**
**MR. LYONS:** I'm going to object to what she told him. It would be hearsay.
**THE WITNESS:** Okay. There were conversations that she had initially with me just to introduce herself. Then after that --
**BY MR. DARVISH:**
Q. She just said, "I'm Helen Robins"?

A. **"I'm Helen Robins. I'm now here in Arkansas. I take care of Mary." She's, I think, her sister. And so there was some communications about who she was.**
Q. Do you recall when that conversation occurred?
A. **I can't offhand.**
Q. Okay. That was the first conversation you had with her?
A. **That's correct.**
Q. Did you have any subsequent conversations with her?
A. **She had called back a couple times. I cannot say specifically how many, but subsequent conversations -- or I should say, to answer your question as to why those distributions stopped was because I received a phone call from her saying that --**
**MR. LYONS:** Object to what Helen Robins said is hearsay.
**THE WITNESS:** I received a call from her saying that Rena was no longer in charge of the trust and to begin sending funds to her.
**BY MR. DARVISH:**
Q. Okay. Do you recall signing all declarations where you declared that Ms. Robins called

obj Plaintiffs

obj. Plaintiff

you on or about August 24, 2015, where she told you that Rena was no longer the manager and that she liked you and she was going to keep you but that she was in charge now and to forward all money directly to her?
A. **That's correct.**
Q. Did you believe that to be true?
**MR. LYONS:** Object. It calls for speculation on his part.
**MR. MILLER:** You could answer.
**BY MR. DARVISH:**
Q. You can answer.
A. **I did not believe that to be true.**
Q. Why not?
A. **Well, I should say I didn't particularly mind who was in charge if a change had happened to the trust. We work for the trust, and therefore, if she says that she's in charge, show me she's in charge and show me that Rena is not in charge or have Rena communicate with me that she's not in charge.**
**But until that, I'm -- I don't -- you know, you can't just take somebody just because they said that. We -- yeah.**
Q. So at this point, have you received any documents that's showed -- shown to you that Helen

Robins was in charge by the time she called you at that point?

**A. Yeah, and I don't recall the timeline; however, I do recall that she submitted a document to us showing that she had power of attorney over Mary Moore Stiny.**

Q. Okay.

**A. And I don't recall any other elements to it as if she was now in charge of what the language was offhand.**

Q. Uh-huh.

**A. But there was language that she showed me that she was now power of attorney of Mary Moore Stiny's Trust and that, therefore, we should believe that that is the case.**

Q. She showed you a document that she was the power of attorney for the trust?

**A. Well, that she was power -- Mary Moore Stiny was now incapacitated mentally.**

Q. Okay.

**A. And that she had been given authority over her affairs.**

**The reason I cannot recall specifically the words in the document is because I can't recall what kind of document it was.**

Q. I understand.

**A. But the language I'm aware of was that Mary Moore Stiny was incapacitated and that she was handling her affairs and to believe that -- that also meant she's in charge now of the trust and that Rena's no longer.**

Q. So at that time, were you -- did you continue making distributions?

**A. No.**

Q. At what point did you stop making distributions from the -- let me ask the question again because I believe you responded before I could finish it.

Did you continue making distributions from the properties to anyone after talking to Ms. Helen Robins?

**A. I have to look in my notes to know what month we stopped making distributions, and from that month on, we did not make any more distributions to anybody.**

**MR. DARVISH:** Okay. Let's go ahead and take a break so we could have him go ahead and look at his notes so he could tell us what date that was.

**THE VIDEOGRAPHER:** The time -- the time is 12:09 p.m. We're off the record.

(Recess taken.)

**THE VIDEOGRAPHER:** The time is 12:13. We're back on the record.

**BY MR. DARVISH:**

Q. So back on the record. You've had an opportunity to look at your records. So I'll ask the question again.

When did you stop making any distributions of the income from the properties?

**A. As of the end of August 2015.**

Q. And what would you do with the money?

**A. The checks were cut in distribution to Park Verdugo Apartments in care of Rena Woods at the Silver Springs address that she gave us, and that's where our distributions went from the property.**

Q. After you stopped making distributions --

**A. No. No.**

Q. Okay.

**A. I'm sorry. Prior to stopping.**

Q. Correct.

**A. To do so.**

Q. Correct. So after you stopped making distributions --

**A. The money remainder in operation accounts.**

Q. What's your current procedure to the income from the properties right now as of today?

**A. We're under a court order to distribute a specific amount of funds to court, I believe, in Arkansas.**

Q. Okay.

**A. And so the distributions are specific, and any extras that are there remains in the account.**

Q. Earlier you testified that you had two to three conversations with Helen Robins.

Did you have any type of correspondences that went back and forth with Ms. Robins?

**A. It's possible that there was some e-mail correspondence as well.**

Q. Do you have copies of those e-mail correspondences?

**A. I -- I believe so, but I'd have to confirm that.**

Q. Can you agree to produce those correspondences if they're in your possession?

**A. Oh, certainly. If I have them, I'm happy to.**

**MR. MILLER:** Can you repeat

specifically what you want him to produce.
MR. DARVISH: Correspondence between him and Helen Robins.
MR. MILLER: Okay. Thank you.
At any time?
MR. DARVISH: At any time.
BY MR. DARVISH:
Q. Have you had any conversations with anyone who's been an attorney for Helen Robins?
A. **I do not recall offhand.**
Q. I'm going to play a voicemail for you.
(Audio playing.)
BY MR. DARVISH:
Q. I just played a voicemail for you.
Do you recall that voicemail?
A. **I do.**
Q. Do you recall who called you now --
A. **Yes.**
Q. -- with regard to attorney for Helen Rob -- Helen Robins?
A. **Yes.**
Q. And who was that?
A. **Mr. Lyons.**
Q. Do you recall when that was?
A. **I do not recall.**

obj
ltf.

Q. All right. I am going to show you what I pre-marked now as Exhibit No. 4.
(Whereupon, Defendant's Exhibit No. 4 was marked for identification by the reporter and is attached hereto.)
BY MR. DARVISH:
Q. Do you recall this e-mail?
A. **Yes. It looks like an e-mail that I received.**
Q. Okay. Was this an e-mail that you sent?
A. **Yes.**
Q. Is it to Mr. Coleman Taylor?
A. **Yes, sir.**
Q. Do you believe that this is a true and accurate copy of the e-mail you forwarded to Mr. Coleman Taylor?
A. **Yes.**
Q. Does the date of Tuesday, November 10, 2015, look --
A. **Yes.**
MR. DARVISH: Let me finish my question. I apologize. I had a pause there.
BY MR. DARVISH:
Q. Does the date November 2015 look like

the correct date that this e-mail was sent?
A. **Yes, it does.**
Q. Do you have a copy of that voicemail somewhere?
A. **I would.**
Q. Did anybody else contact you with regard to representing Helen Robins?
A. **I do not recall the connection between the phone calls that I received and their relationship to Helen Robins offhand.**
Q. Okay.
A. **Yes.**
Q. And just so we're clear on Exhibit No. 4, just so we're sure, this is -- this e-mail would be a true and accurate copy of the e-mail that you sent to Mr. Coleman?
A. **Yes. And after hearing the voicemail, knowing that he has a representation for Helen Robins, it's clear that that is the relationship and that's who left me this message. So I am aware of this message.**
Q. And you did hear that message --
A. **Yes, I did.**
Q. -- as it was?
I am showing you now what has been premarked as Exhibit No. 5.

obj Plaintiff
obj Plaintiff
obj Plaintiff

(Whereupon, Defendant's Exhibit No. 5 was marked for identification by the reporter and is attached hereto.)
BY MR. DARVISH:
Q. Can you read that document for me.
A. **This is the -- this is by Mark R. Johnson, attorney pursuant to the order of the Circuit Court of Lawrence County, probate division Mark Johnson, attorney for Helen Robins, the permanent guardian of Mary Moore Stiny requests that you cooperate with any and all requests.**
Q. I guess the question I wanted to ask you is do you recall ever receiving this correspondence?
A. **I do.**
Q. Do you recall receiving this -- when do you recall receiving this correspondence?
A. **Around the date of March 16, 2016, when this was dated. I do not recall specifically what date.**
Q. But it was around that date?
A. **That's correct.**
Q. And this is a true and accurate copy of the document you received?
A. **That is correct.**
Q. Do you know what the context of the letter is?

A. Saying that Mark R. Johnson, attorney for Helen Robins, is the guardian -- as the guardian of the Mary Moore Stiny -- the guardian of Mary Moore Stiny.

Q. When did you believe that that -- your understanding of that was?

A. I believe that these requests were being made on behalf of Helen Robins and that the -- I was not -- I was being -- well, this was a request by Helen Robins; however, I don't work for Helen Robins, and I don't have a relationship with Helen Robins; so I forwarded this on to the attorney for Rena Wood, who is the person who hired me to manage these buildings of which that is our responsibility.

Q. So at this point, your understanding was that Ms. Robins had two attorneys; correct?

MR. LYONS: Object. Calls for speculation.

THE WITNESS: I do not know for sure offhand.

BY MR. DARVISH:

Q. But you received two separate --

A. Yes. Yes.

Q. Correspondences --

A. Correct.

Q. One voicemail --

A. From Jim Lyons.

MR. MILLER: Wait for him to finish his question.

THE WITNESS: I'm sorry. My apologies.

MR. DARVISH: She'll be the one -- I'll be honest. Normally, I get yelled at.

THE REPORTER: You're getting eyes.

BY MR. DARVISH:

Q. You received one voicemail --

A. That's correct.

Q. -- from Mr. Lyons, and you received another correspondence from another attorney saying they represent Helen Robins?

A. Correct.

Q. Have you ever spoken to a person by the name of Steve Baker?

A. I have.

Q. Who is he?

A. I believe -- I do not recall him offhand. I just recall his name and --

Q. Do you remember when you spoke to him?

A. I don't recall offhand.

Q. And do you remember the substance of the conversations you had with him?

A. I cannot speak specifically to the conversation. I can only recollect that it is in relationship to this matter and that if I -- my memory serves me correctly, he was a representative of the bank.

Q. Okay.

A. The Centennial Bank and Trust, I believe.

Q. Centennial Bank and Trust.

I am showing you what has now been premarked as Exhibit No. 6.

(Whereupon, Defendant's Exhibit No. 6 was marked for identification by the reporter and is attached hereto.)

BY MR. DARVISH:

Q. Can you read that document for me, please.

A. Sure. Centennial Bank was --

Q. To yourself. I'm sorry.

A. Oh, I'm sorry.

(Document reviewed by the witness.)

THE WITNESS: Yes, I recall this document.

BY MR. DARVISH:

Q. Is it fair to say that you received

this document in February -- roughly around February 6 of 2016?

A. Correct.

MR. LYONS: The letter is dated February 8.

MR. DARVISH: February 8. I apologize.

MR. LYONS: Yeah.

MR. DARVISH: My eyesight's going bad.

BY MR. DARVISH:

Q. What is the substance -- what is this document to you?

A. A request for documents.

Q. Okay. Do you recall when you received it?

A. I do recall.

Q. And is this a true and correct copy of the document that you received?

A. Yes, I believe so.

Q. Okay. What did you do after you received this document?

A. From what I recall, I believe I also forwarded this on to the attorney for Rena Wood.

Q. Okay.

A. And I may have also -- again, I'm not -- I vaguely remember responding to him to let him

bj
tf.

**know that I'm unable to do anything without permission from Rena Wood, if I recall correctly. I don't have it in front of me, but that's what I recall.**

Q. I am showing you what's now been pre-marked as Exhibit No. 7.

(Whereupon, Defendant's Exhibit No. 7 was marked for identification by the reporter and is attached hereto.)

**BY MR. DARVISH:**

Q. What is this document?

**A. This is an e-mail that I generated, wrote, in response to Steve Baker in response to his e-mail -- or I should say letter --**

Q. Uh-huh.

**A. -- informing him that all correspondence and requests should be sent to and granted by Rena Wood and her attorney, Coleman Taylor, who I cc'd on this e-mail.**

Q. After sending that e-mail out, did you send it to Mr. Baker or Mr. Lyons or to anyone at Centennial the documents that were requested?

**A. No. Not without permission or --**

Q. Did you ever receive permission?

**A. I did receive permission at a later date.**

Q. Okay. How far later?

**A. I cannot recall the date offhand.**

Q. The date on that e-mail is?

**A. February 18 --**

Q. Okay.

**A. -- 2016.**

Q. So I'm going to now show you, just for authentication purposes, the e-mail you see before you as Exhibit 8 a true and correct copy of the e-mail that you sent?

**A. Yes.**

**I'm showing you now what is now being marked as Exhibit No. 8.**

**(Whereupon, Defendant's Exhibit No. 8 was marked for identification by the reporter and is attached hereto.)**

**BY MR. DARVISH:**

Q. Do you remember Exhibit No. 8?

A. Yes.

Q. Can you brief me as to when you sent this e-mail?

**A. March 18.**

Q. And you sent it to Mr. Baker; correct?

**A. Yes, I did.**

Q. Did you receive approval to send this

information to --

**A. Yes, I did.**

Q. Okay. How often did you generate these cash flow statements?

**A. Monthly.**

Q. And these cash flow statements, you testified earlier you would send reports to both Rena and to Ms. Stiny at her address; correct?

**A. That's correct.**

Q. All right. And with regard to the cash flow statements, were those part of the reports that you would send?

**A. Yes, they are.**

Q. So you would -- your testimony here today is that you did send cash flow statements to Arkansas to Ms. Stiny?

**A. That is correct.**

Q. And that would be on a monthly basis?

**A. Okay.**

Q. So you prepared this e-mail and the attached cash flow statement and sent it to Mr. Baker.

Did he give you a response?

**A. I cannot recall offhand.**

Q. Did you receive any response from anybody with regard to sending out the cash flow

statements after you sent these off?

**A. I believe so, but I don't remember without seeing it in front of me. I cannot remember if he responded or there was a response, but I do know I sent this out.**

Q. Okay. Did you communicate with anybody else with regard to the cash flow statements in the management agreement in this e-mail?

**A. Well, I copied Coleman Taylor on this e-mail.**

Q. Was there anybody else you discussed with it?

**A. Not that I recall, no.**

Q. All right. At this time, who was your understanding was the trustee of the trust at this point?

**MR. LYONS:** Objection. Calls for a legal conclusion. It also calls for hearsay unless he testifies he's read and reviewed the document.

**BY MR. DARVISH:**

Q. You can answer that question.

**A. We were hired by Rena Wood to manage these properties. That is who we took direction from, and that is who we were under the impression we took direction from the beginning of time.**

Obj. Pltf.

Page 66

Q. At this point had you received any court orders or any kind of verification that somebody else, besides Rena Wood, would be entitled to the money or the income from the properties?
**MR. LYONS:** You say at that time. I object because it doesn't say what time.
**MR. DARVISH:** Thank you.
**BY MR. DARVISH:**
Q. At the time of March 18 of 2016 -- can you read me the last question, please.
(Record read.)
**BY MR. DARVISH:**
Q. On Friday March 18, 2016, had you received any court orders or any type of other document authorizing you to distribute any of the money from the properties to anyone else besides --
**A. I cannot recall the specific dates, but I did receive that correspondence that you see.**
Q. Correct.
**A. And I can't recall the time frames of those -- those documents, but I did receive multiple calls and multiple documents from multiple people saying that things were changed or changing or that they were now in charge and then these correspondence then produced themselves to me.**

Page 67

**So I cannot recall the timeline, but I can tell you that I had received calls and e-mails of this nature in these letters all in that period of time letting me know that something had changed.**
Q. I understand.
Have you ever received a document -- or court order that directed you to pay money to anyone except to the court registry?
**A. I do -- I do recall a document in court letting me know -- I just don't remember exactly the terms of the document.**
Q. Okay.
**A. However, I believe there was some directives given to us letting us know that money should be given to Helen Robins or to Mary Moore Stiny. I just don't remember in front of me here, but that was the reason why the confusion began -- or that was during the time the confusion began of who's in charge or what's going on. And that's, you know, then why we stopped altogether with sending any monies until we got you guys -- they got this figured out.**
Q. At this point did Rena demand that you turn over all the money to her?
A. No.
Q. And in fact, you had not given any

obj. pltf.

Page 68

money to Rena at this point?
**A. No, it was Rena's directive to tell me not to do anything until this gets resolved.**
Q. And Exhibit No. 8 is a true and correct copy of the document that you sent; correct?
**A. I believe so.**
Q. Okay. I am showing you what is now being pre-marked as Exhibit No. 9.
(Whereupon, Defendant's Exhibit No. 9 was marked for identification by the reporter and is attached hereto.)
**BY MR. DARVISH:**
Q. Can you read the document to yourself, please.
**A. Uh-huh.**
**(Document reviewed by the witness.)**
**BY MR. DARVISH:**
Q. Do you recall this document?
**A. I do.**
Q. Is this a true and correct document of the document you received from Eric Nelson?
**A. I believe so.**
Q. Is there anything that would -- that would make you believe that this is not a true and correct document from Mr. Nelson?

Page 69

**A. I do not believe so.**
Q. What is this -- who is Eric Nelson?
**A. My understanding is --**
**MR. LYONS:** Objection. Calls for -- your understanding comes from what someone told you or from what you read. If it's from what someone told you, then object. It calls for hearsay.
**THE WITNESS:** I cannot recall who Eric Nelson is.
**BY MR. DARVISH:**
Q. What's your understanding, in reading of the document, as to who Eric Nelson is?
**A. My understanding of who Eric Nelson is is that he is the successor trustee of the Exemption, Marital and Survivor's Trusts contained in the Elijah and Mary Stiny Trust.**
Q. Did Mr. Nelson provide you a copy of the trust?
**A. I cannot recall if he did. I was -- yeah.**
Q. Did you receive this by e-mail? Do you recall, or did you receive it in the mail? If you don't recall --
**A. I'm sorry. Yeah, I don't recall.**
Q. Did you provide Mr. Nelson as to what

Page 70

he wanted to pursue to the correspondence?
A. I did not.
Q. So let's go over this document here. And I'm looking at Mr. Nelson's correspondence. Let's take it paragraph by paragraph here.
The first paragraph, can you read out loud for me.
A. (Reading):
"As you've been advised from the correspondence you have received from Attorney Jim Lyons, I am the successor trustee of Exemption, Marital, and Survivor's Trusts contained in the Elijah and Mary Mon -- Elijah and Mary Stiny Trust, which contains subtrusts known as the Exemption, Marital and Survivor's Trusts."
Q. Now, did you receive a correspondence from Mr. Lyon that said that Eric Nelson is a successor trustee?
A. Oh, did I receive correspondence from Jim Lyons?
Q. Yes.
A. That he was successor trustee?

Page 71

Q. Yes.
A. I do not recall, but I could have because, you know, I received a lot of these different notices --
Q. Could you look in your records and find for me where -- correspondence from Mr. Lyons? Can you produce that for me after this deposition?
A. If I have it, I'm glad to provide it.
MR. DARVISH: Okay. Can we get an agreement on that, Counsel?
MR. MILLER: It is correspondence from Jim Lyons?
MR. DARVISH: Correct.
MR. MILLER: Designating Eric Nelson as successor trustee of the --
MR. DARVISH: Exemption, Marital and Survivor's Trusts.
MR. MILLER: He will.
MR. DARVISH: Perfect. Thank you.
Let's go ahead and take a quick break. Go off the record.
THE VIDEOGRAPHER: This marks the end of media number one in the deposition of Paul Tennen. The time is 12:40 p.m. We're off the record.
///

Page 72

(Lunch recess was held from 12:40 p.m. to 1:05 p.m.)

Page 73

LOS ANGELES, CALIFORNIA
OCTOBER 18, 2018; 1:27 P.M.

THE VIDEOGRAPHER: We are back on the record. The time is 1:27 p.m. And this marks the beginning of media 2 in the deposition of Paul Tennen.

EXAMINATION
BY MR. DARVISH:
Q. So we're back on the record after lunch. We're going to start back where we left off, which was Exhibit 9.
A. Oh, here you go.
Q. Perfect.
So you earlier testified that you received a letter from Mr. Nelson.
A. Yes.
Q. I seemed to have -- my copy has disappeared. I'll take a look at that really quick.
So you received a copy from Mr. Nelson on or around February 9, 2016; correct?
A. Uh-huh. Yes.
Q. And in that letter, my understanding is -- and correct me if I'm wrong, Mr. -- he had -- basically, you had received a correspondence from

Mr. Lyons that he is a successor trustee of Exemption, Marital, and Survivor's Trusts?

**MR. LYONS:** Object to form. That insinuates that I'm the trustee.

**THE WITNESS:** Yeah, that Mr. Nelson was.

**BY MR. DARVISH:**

Q. That Mr. Nelson was. Let me rephrase the question. Thank you.

You received a letter from -- you had received a correspondence from Mr. Lyons that Mr. Nelson was now the successor trustee of the Exemption, Marital and Survivor's Trusts?

A. **That is correct.**

Q. At this point, had you made any distribution to anyone?

**MR. MILLER:** Objection. Vague as to time.

**BY MR. DARVISH:**

Q. As of February 16, 2016, after this February 6 of 2016, had you made any distributions --

A. **No.**

Q. -- as a result of this correspondence?

A. **No.**

Q. Did Mr. Nelson provide you any other

documents except this correspondence showing you that he is successor trustee of the Exemption, Marital and Survivor's Trusts?

A. **I do not recall beyond this document.**

Q. This document (indicated)?

A. **Yeah.**

Q. Okay. In the correspondence, it requests that you provide -- and if you could follow along with me here.

In 2014, I do not have statements for February, April, August, and October through December. I presumed that he's asking for monthly statements for both buildings.

A. **Correct.**

Q. Did you send monthly statements to Ms. Stiny at the address that was provided to her in Arkansas?

A. **At this time or in general?**

Q. Prior to this time, you had been sending --

A. **That's correct.**

Q. -- monthly statements on a regularly and monthly basis, all the information that Mr. Nelson is requesting in this correspondence.

A. **Prior to -- yes, during the beginning**

**of time --**

Q. Yes.

A. **-- and then I believe it also may have -- I cannot recall when we stopped sending those to Ms. Stiny, but prior -- I mean, from 2013, at least for a year or two years beyond that, we had been sending those statements.**

Q. Okay.

A. **I cannot recall what date we stopped sending those, and we were just sending Rena, but I believe it was -- certainly prior to this date we were.**

Q. Do you have records as to when --

A. **I have the final date. I just don't know it offhand of when I stopped sending reports to Mrs. Stiny but prior to that.**

Q. Why would you stop sending reports to Ms. Stiny?

A. **I don't recall what the reason was; however, there was -- at some point we had stopped, and I think it was around the -- August 15, same time we stopped sending the distributions because we basically stopped sending everything except for the hard copy report to Rena around that time. I cannot recall exactly the dates.**

Q. Okay.

A. **But from 2000 -- from the day we took over through at least a year and change, we were sending the monthly reports.**

Q. Okay. At some point did you start sending monthly reports again?

A. **To -- since that time, no.**

Q. Okay. Did you send Mr. Nelson the monthly reports?

A. **No. No.**

Q. Okay. When was the next time you sent monthly reports out?

A. **We have consistently sent Rena a monthly report to this day.**

Q. Okay.

A. **If I recall, the reason we stopped because she got removed to a -- Ms. Stiny was removed to a facility. It was a hospital or something, and therefore, she wasn't in that address anymore, and then we were told not to do that anymore, I believe, by Rena; but I do not recall specifically why that was done.**

Q. But you did send -- just to clarify the record, you did send monthly statements after February 9?

A. **To Rena.**

Q. But you also sent them to other people

as well; correct?
A. Well, per the -- this Exhibit A, for example --
Q. Correct.
A. -- yes, if that's what you're asking.
Q. That's what I'm asking.
A. Yes.
Q. Exactly. That's what I wanted to clarify.
A. So only per these type -- these instructions --
MR. MILLER: Again, you're talking over each other.
THE WITNESS: I'm sorry.
MR. MILLER: That's okay.
THE WITNESS: Yes. If that's what you mean by, yes, these were sent, for example.
BY MR. DARVISH:
Q. All right.
A. However, what I was referring to was our normal monthly sending out a report. We sent one, I believe, via hard copy and also via e-mail.
Q. Uh-huh.
A. And that goes to Rena.
Q. Okay. Did you continue sending monthly

statements?
A. No, not in this situation. Only this time.
Q. Okay.
MR. LYONS: Object, form. You said, "Did you continue to send monthly statements?" To whom?
BY MR. DARVISH:
Q. Good question.
With regard to Exhibit 8, after you sent the cash flow -- the monthly cash flow statement to Mr. Baker, did you send the cash flow at any other point in time after -- after this time?
A. I do not believe so. I do not. I don't believe so, no.
Q. You don't believe so, or you don't recall?
A. I do not recall sending it anymore.
Q. So who's currently getting the monthly cash flow statements?
A. Rena Wood.
Q. Anyone else?
A. No one.
Q. Has anyone requested additional monthly cash flow statements from you?
A. Not since this interaction or this

request.
Q. So you were only asked one time by Mr. Baker from Centennial Bank to provide you the cash flow statements, and that was the only time you provided it, and you had not been requested for any statements since then?
A. I don't recall any other requests. I only recall this particular request.
Q. And if they had requested it, would you have provided it to them?
A. Subject to approval, yes.
Q. Did you receive an e-mail from anyone telling you that you should cooperate with Mr. Baker?
A. Yes. Mr. Coleman --
Q. Okay.
A. -- directed me on behalf of Rena Wood to -- I'm sorry, Mr. Taylor -- to send this --
Q. Okay.
A. -- this e-mail, which is Exhibit 8.
Q. All right. And at that point in time, Mr. Baker never followed up with you and asked you for additional documents --
A. Not that I recall, no.
Q. All right. Do you ever have -- `do you recollect having conversation with Mr. Nelson?

A. I -- I do not recall if I specifically spoke to Eric Nelson; however, I did receive this correspondence, Exhibit 9, and, perhaps, another correspondence via e-mail or letter. I cannot recall specifically, but that's been my limited scope with Eric Nelson.
Q. What did you do with the other correspondence, if you -- if you recall, what did you do with the other correspondence that you received from Mr. Nelson?
A. All requests given to me were forwarded to Rena Wood's representation at that time. During this period, it was Coleman Taylor. Prior to that, I believe it was somebody else.
However, most of the correspondence that I have through this period is through Coleman Taylor, and all requests were submitted to Rena Wood's representation prior to anything being done about it.
Q. But you do not recall having a conversation with Mr. Nelson at all?
A. I cannot recall offhand, specifically, if there was a phone call. I just cannot speak to specifics to that. I cannot.
Q. In the correspondence, it says:
"There may be some

considerable weight involving shipping these copies. I would very much like to meet in any event. So, perhaps, we could arrange to meet at your office in the near future."

Did he ever come by your office?

**A. He did not that I remember, no.**

Q. Did you receive any communication from anyone about Mr. Nelson's role with regard to the trust outside of this correspondence?

**A. I don't -- I don't recall receiving any information.**

Q. And this is a true -- Exhibit 9 is a true and correct document of the document that you received from Mr. Nelson?

**A. I believe so, yes.**

Q. I am going to show you what is now being premarked as Exhibit No. 10.

(Whereupon, Defendants' Exhibit No. 10 was marked for identification by the reporter and is attached hereto.)

**BY MR. DARVISH:**

Q. Can you read that for me, please.

**A. This is the -- oh, read it to myself?**

Q. Read it to yourself, please.

(Document reviewed by the witness.)

**BY MR. DARVISH:**

Q. Have you had an opportunity to review Exhibit No. 10?

**A. Yes.**

Q. Do you know what it is?

**A. Yes, this is a declaration in support of Respondent Rena Wood's opposition to Petitioner Centennial Bank.**

Q. Whose declaration?

**A. Mine.**

Q. You've had an opportunity to read every single one.

Is this a true and correct copy of the document that is -- that you signed?

**A. Yes.**

Q. Is every single item -- every single declaration that you have made in this document true and accurate?

**A. Yes, I believe it to be.**

**MR. DARVISH:** Let's go off the record.

**THE VIDEOGRAPHER:** The time is 1:42 p.m. We're off the record.

(Recess taken.)

**THE VIDEOGRAPHER:** The time is 1:56 p.m. We're on the record.

**EXAMINATION**

**BY MR. LYONS:**

Q. Mr. Tennen, I'm Jim Lyons, and I represent Centennial Bank in regard to this litigation. I have handed you a set of binders, Volume I being Linder & Associates' financial statements from 2013 through 2015.

Did you produce, beginning in April of 2013 all the way through 2015 financial statements for the Sixth Street Apartments?

**MR. DARVISH:** I'm going to place an objection on record as to form and to relevance to the documents that are being authenticated.

**BY MR. LYONS:**

Q. Did you produce financial statements in regard to the Sixth Street Apartments for -- that are owned by the Stiny Trust? And we're just going to call it the Stiny Trust rather than get into the subtrust for now.

Obj.
Def.

**A. Yes, I did.**

Q. And are these documents prepared in the normal and ordinary course of business, sir?

**A. Yes, they are.**

Q. And are these produced at or near the time that the information is gathered?

**A. Yes.**

Q. And are the records kept in the course of regular conducted activity of business?

Obj.
Def.

**A. Yes, they are.**

Q. Is the making of these records a regular practice or your activities as the real estate manager for the property?

**A. Yes, they are.**

Q. Are you the custodian of these records or another qualified witness with the authority to review and testify as to the authenticity of these documents, sir?

**A. I am and my staff. We prepare the documents, and I am aware of them, and I keep them.**

Q. All right. And you do that for both sets of apartments. One of them is known as the Sixth Street Apartments; is that correct?

**A. That is correct.**

Q. And the other one is known as the Olive Street Apartments; is that correct?

**A. That's correct, sir.**

Q. And you produced those from April of

2013 up until the most recent statement every month from 2013 to -- we're in October. So through September of 2018; is that correct?
A. **That's correct.**
MR. DARVISH: Objection as to form.
THE WITNESS: That is correct.
BY MR. LYONS:
Q. Okay. And you did review all of these, and these appear to be true and correct copies of the financial statements that your office produced in the normal and ordinary course of business; is that correct?
A. **That is correct.**
THE VIDEOGRAPHER: You may have unhooked.
MR. LYONS: I'm sorry.
BY MR. LYONS:
Q. Has the Darvish Firm ever represented you or your firm in any manner of any kind, sir?
A. **Not that I'm familiar with.**
Q. Has Mr. Elan Darvish ever represented you or your firm in any manner of any kind?
A. **Not that I'm aware of, no.**
Q. Who is the client, as far as you're concerned, in regard to the Stiny Trust?
A. **My client is Rena Wood Powell or Rena**

**Powell Wood.**
MR. MILLER: Objection. Vague, the question.
BY MR. LYONS:
Q. Tell the jury when you were contacted about the apartments, please.
A. **In -- when I was contacted?**
Q. Yes, sir.
A. **In 2013 we were contacted by Rena Powell Wood to manage her -- the buildings that she had under -- under her management at the time, I guess, or control over.**
MR. LYONS: If you would mark that as Plaintiff's Exhibit No. 1, please.
(Whereupon, Plaintiff's Exhibit No. 1 was marked for identification by the reporter and is attached hereto.)
BY MR. LYONS:
Q. You've been handed a document that is marked as Plaintiff's Exhibit Number 1.
Is that correct, sir?
A. **Yes, that is correct.**
Q. If you would look on page -- it's Stiny BOA page 419, sir. If you would, tell me what that is.
A. **A check copy --**

MR. DARVISH: Objection as to form.
BY MR. LYONS:
Q. Do you recognize that document, sir?
MR. DARVISH: Same objection.
THE WITNESS: This is a copy of a check that we generated.
BY MR. LYONS:
Q. And is that document a check -- who is that signed by, sir?
A. **It's probably myself, or at the time, there was another accounting person there that generated the checks, but that looks -- it looks like mine, my signature.**
Q. All right. And that's Check No. 59216, sir; is that correct?
A. **That's correct.**
Q. And that's written on rental trust account of Linder & Associates; correct?
A. **Correct.**
Q. And payable to apartment -- Vertigo Apartments?
A. **That's correct.**
Q. Do you know whether 1132 Vista Ridge is Rena Wood's address at that time, sir?
A. **I believe so.**

Q. Why was that check made out to Park Verdugo Apartments, sir?
A. **That was the account that we were instructed to cut distribution checks to -- or the account name, I should say.**
Q. Who instructed you that?
A. **Rena Wood.**
Q. And who told you to send that check to that address?
A. **Rena Wood.**
Q. All right. If you would look at the check number which is marked Stiny BOA 430, sir.
Tell us whether you recognize that, sir.
A. **I do.**
Q. And if you would, please explain to us what this is.
MR. DARVISH: Instead of having me object as to each one of the checks that you intend to ask him about, would you stipulate to a running objection --
MR. LYONS: Sure.
MR. DARVISH: -- with regard to this form?
MR. LYONS: Sure.

MR. DARVISH: And its relevance.
MR. LYONS: Sure. That's fine.
BY MR. LYONS:
Q. Go ahead, sir.
A. **What was your question? I'm sorry.**
Q. Who told you to generate this check?
A. **Well, this was -- this was a check we would normally cut; however, it looks like there was an address change at some point.**
Q. And who told you to change the address?
A. **That would have been Rena Wood.**
Q. Did you continue to send checks to Ms. Rena Wood as shown on Stiny BOA 452, Stiny BOA 450 -- 485, Stiny BOA 523, Stiny BOA 547, Stiny BOA 558? Did you continue to generate those checks each month to Rena Wood at her request from the rental trust account of Linder & Associates?
A. **That is correct.**
Q. And where did that money come from, sir?
A. **From distributions from the property's operational account.**
Q. And when you say "the property," you -- there's actually two properties --
A. **That's correct.**

Obj.
Def.



Q. Correct?
The Sixth Street Apartments and the Olive Street Apartments; correct?
A. **That's correct.**
Q. And these $20,000 per month checks that were sent to Ms. Rena Wood --
A. **Uh-huh.**
Q. -- made out to Park Verdugo Apartments, those were generated from the income from the Sixth Street property and from the --
A. **Olive Street.**
Q. -- Olive Street?
A. **That is correct, sir. Operation, yeah.**
Q. If you would turn to the very next page, sir. And that's Stiny BO -- Stiny BOA 559, sir.
A. **Oh, 559?**
Q. Yes, sir.
A. **Okay.**
Q. And that one is also to the Keystone address; is that correct, sir?
A. **That's correct.**
Q. And you understood that to be Ms. Rena Wood's address; is that right?
A. **That's correct.**
Q. Then if you would look, turn over to

Obj.
Def.



page Stiny BOA 572, please, sir.
A. **Okay.**
Q. What is that, sir?
A. **That is a check that was produced by us.**
MR. DARVISH: So we have the same running objection; correct?
MR. LYONS: Yeah. You got it on all the Stiny BOA until I finish with those, and I'll tell you when I'm finished.
MR. DARVISH: Fantastic.
BY MR. LYONS:
Q. And this one is to care of Rena Wood 2875 Sulphur College Road in Hartsville, Tennessee; is that correct?
A. **That's correct.**
Q. Why was the address changed?
MR. DARVISH: Objection. Calls for speculation.
THE WITNESS: **We were given direction to change the address to the new mailing address.**
BY MR. LYONS:
Q. Who gave you that instruction?
A. **Rena Wood.**
Q. Was it your understanding from Ms. Wood

obj
Def.
obj.
Def.
obj.
Def.



that she had moved to Hartsville, Tennessee?
A. **Yes.**
Q. Did those checks continue at the rate of approximately $20,000 per month until August 1 of 2015?
A. **Yes. Approximately, yeah.**
Q. If you would look at Stiny BOA 852, which is the last page of that document.
A. **Stiny BOA --**
Q. BOA.
A. **-- 852?**
Q. 852. It's the last page of Plaintiff's Exhibit 1, sir.
A. **Okay.**
MR. MILLER: Which one?
THE WITNESS: 852.
BY MR. LYONS:
Q. 852, the last page.
Earlier during Mr. Darvish's questioning of you, you mentioned that you ceased to issue checks to Park Verdugo Apartments in August of 2015; is that correct?
A. **Yes, the last month of distribution was in August.**
Q. Why did you stop sending those checks

obj.
Def.

Page 94

to Ms. Wood, sir?
A. **Because it was around that time that we were getting conflicting reports about who was in charge of our relationship, I guess, or management of the property.**
Q. Now, I'll show you what's been marked as Defendant's Exhibit No. 1, which is a copy of the Stiny Trust pertaining to the Olive Avenue Apartments.
Do you recognize that, sir?
A. **I do.**
Q. And you looked at this document earlier during Mr. Darvish's questioning; is that correct?
A. **I did.**
Q. Who does it say is the owner of the apartment on the first page of that document?
A. **Stiny Trust.**
Q. And on Exhibit 2, that was introduced during Mr. Darvish's questioning. Ask you to look at that.
Do you recognize that, sir?
A. **I do.**
Q. And who does that document show is the owner of the apartments?
A. **This one says --**
**MR. MILLER:** I would object. These

Page 95

documents speak for themselves.
**BY MR. LYONS:**
Q. Go ahead.
**MR. MILLER:** You can answer. Go ahead.
**THE WITNESS:** Elijah and Mary Stiny Trust.
**BY MR. LYONS:**
Q. And you indicated that the reason for the difference in those was because you checked not the actual real estate records but some sort of summary of the real estate records, and one had a shortened name; is that correct, sir?
A. **Yes. There was -- there's an online through the title company that is used, I guess, commonly used. The naming of the title -- on title for the ownership of property was dated as such.**
Q. So did every check that was issued between December 13 until August of 2015 to Park Verdugo Apartments, were those sent to Ms. Rena Wood in Tennessee?
A. **Well, the address --**
**MR. DARVISH:** Objection as to form.
**THE WITNESS:** -- is changed. The address is changed in where we were sending them, but they were cut to the same, as I mentioned earlier; that

Page 96

they were to the Park Verdugo Apartments.
**BY MR. LYONS:**
Q. But in December of '13, that was when you changed to Hartsville in Hartsville, Tennessee; is that correct?
A. **That's correct.**
Q. And from December '13 until August of '15, all of those checks were mailed to Ms. Rena Wood in Hartsville, Tennessee; is that correct, sir?
A. **I -- I believe --**
**MR. DARVISH:** Objection as to form.
**THE WITNESS:** I believe so. I don't have it in front of me. I'm assuming that's what it was after the address was changed.
**BY MR. LYONS:**
Q. Well, you have the -- you can look on --
A. **Oh, yes.**
Q. -- Plaintiff's Exhibit No. 1.
A. **Yes. Then, yes, those are all Sulphur College Road.**
Q. In Tennessee; correct?
A. **That's correct.**
Q. What happened to cause you to change that from Park Verdugo Apartments without care of anyone

Page 97

to adding care of Rena Wood on those checks, sir?
A. **Honestly, I cannot speak to that. I don't know why. It probably was a change in our -- maybe our accounting process, or -- I don't have any particular reason why it was changed.**
Q. Looking at what was introduced as Defendant's Exhibit 1, who signed that document, sir?
A. **Rena Powell Wood.**
Q. And it shows there is a signature line for owners; is that correct?
A. **That's correct.**
Q. Did she represent on that page of the document that she was the trustee?
A. **She rep -- she represented herself as the trustee of the trust.**
Q. Sir, did she represent on what's been introduced as Exhibit 1 on the second page signature line where it says Rena Powell Wood owner --
A. **Uh-huh.**
Q. -- did she indicate on there that she was the trustee?
**MR. DARVISH:** Objection --
**MR. MILLER:** Objection --
(Speaking simultaneously.)
**MR. DARVISH:** -- as to form. And the

Obj. Def

Obj. Def

Obj. Def

Obj. Def

document speaks for itself.
MR. MILLER: Same objection.
THE WITNESS: It is not written here, no.
BY MR. LYONS:
Q. And looking at Exhibit 2, which is the property management agreement for the Sixth Street Apartments on that document, did Ms. Rena Powell Wood indicate that she was the trustee?
MR. DARVISH: Objection as to form. The document speaks for itself.
MR. MILLER: Join on that objection.
THE WITNESS: No.
BY MR. LYONS:
Q. Did you review the entire trust agreement to determine whether she was the trustee, sir?
**A. I did not review the entire trust agreement. I did receive documentation from her that she had -- she was a co-trustee of the Stiny Trust.**
Q. And you believed her to be a co-trustee of the Stiny Trust, of the entire Stiny Trust?
**A. That is correct.**
Q. And she --
MR. DARVISH: Objection as to form.
///

BY MR. LYONS:
Q. And you said you received documentation from her to that effect; is that correct?
**A. Yes.**
Q. What did you receive, sir?
**A. My recollection is that there was a document that lay -- that stated that she was co-trustee of the Elijah and Mary Stiny Trust dated 2000 something. There was a document that indicated that she was.**
Q. Do you know what that document was, sir?
**A. I believe it was the trust.**
MR. MILLER: Object. That calls for a legal opinion.
MR. DARVISH: And also it calls for speculation.
MR. MILLER: Belated objection.
BY MR. LYONS:
Q. And you -- did you take that document to your attorney or to any attorney to review that to determine if she was, in fact, the trustee of the Elijah and Mary Stiny Trust or of the Stiny Trust or of the Exemption Trust or of the marital trust or of any trust?
MR. MILLER: Objection. It calls for privileged attorney-client communication.

Don't answer the question.
MR. LYONS: The communication was between Mary Stiny and Mr. Powell -- I mean -- I'm sorry -- Mr. Tennen, and there is no attorney-client privilege for that.
And if you're instructing him not to answer, then we will need to call the Court.
MR. MILLER: That question asked if he brought the documents to his attorney and consulted with his attorney as to the effect of those documents. And that is not a -- that is a privileged communication. He's asking -- you're asking about communications between himself and his attorney related to something.
MR. LYONS: I only asked if he consulted with an attorney. That is not privileged, sir.
MR. MILLER: Okay. You can -- you can answer that one. It's not the communication itself. I agree.
THE WITNESS: I did not.
BY MR. LYONS:
Q. Did you do anything other than see the document that Ms. Wood brought to you and take it at what you believed to be face value, sir?
**A. I did.**

Q. What else did you do, sir?
MR. MILLER: Objection. Vague.
THE WITNESS: What do you mean what else did I do?
BY MR. LYONS:
Q. I asked you if you did anything else to determine that Ms. Rena Powell Wood was the trustee of any of the trusts that were the owner of the Sixth Street Apartments or the Olive Avenue Apartments, and I'm asking what else you did, sir.
**A. I did not do anything else.**
Q. Have you ever fully and completely read the trust document, sir?
**A. I cannot say I have.**
Q. Can you tell me whether you ever took them to an attorney for review, sir?
**A. I did not.**
Q. It's my understanding that on both of plaintiff's -- I'm sorry -- Defendant's Exhibit 1 and Defendant's Exhibit 2 that you received a management fee of 5 percent of the gross income; is that correct?
**A. That's correct.**
Q. If you would, please tell me, generally, what your management of the Olive Street Apartments and the Sixth Street Apartments covered, sir.

Obj. Def

A. That would cover a collection of rents, facilitation of maintenance, facilitation of accounting-related functions such as payment of bills, fielding of calls from tenants, and basic management of the property.

Q. Anything else that you can think of, sir?

A. There is a variety of functions that we do. We, you know, pay the bills. We ensure compliance with insurance inspections and code compliances both with the city and local governments. We facilitate trash pickup. We coordinate parking responsibilities. We lease the apartments for rent. We market them. We facilitate the unit turnover of rents of the apartments. We handle leaks and roof-related repairs, AC related repairs. All of that gets facilitated through the property.

**MR. MILLER:** I'm going to object that the question was vague and overbroad.

**BY MR. LYONS:**

Q. Anything else that you can tell us that you do, sir?

**MR. MILLER:** Same objection.

**THE WITNESS:** Yeah, nothing else that comes to mind at the moment.

**BY MR. LYONS:**

Q. Do you have on-site managers at both of those apartments -- sets of apartments, sir?

A. We do.

Q. Did Mary Stiny tell you to do these things in writing, or were these things that you would get from conversations with her?

**MR. MILLER:** Objection. Vague as to "these things."

**MR. DARVISH:** Objection as to form. Lacks foundation.

**THE WITNESS:** You mean Rena Wood?

**BY MR. LYONS:**

Q. Yes, Rena Wood.

A. We received direction via e-mail and phone call, a variety of directions.

Q. Will you provide us with copies of all of the e-mails that you have between your office and Rena Wood's office from April of 2013 to the present, sir?

**MR. DARVISH:** Objection subject to the conversation and stipulation between counsel, and if we cannot come to an agreement to any documents that would be provided, then we would obviously have to have the Court involved.

If there is a stipulation, then, obviously -- or the Court creates a further order that any documents, obviously, it would be subject to your -- your agreeing to provide.

**THE WITNESS:** That is correct.

**MR. MILLER:** We will agree based on that stipulation.

**MR. DARVISH:** Do you agree with that stipulation?

**MR. LYONS:** I -- I do not agree with your interpretation of what the Court said, but we've already discussed that. Both of us are not positive what the Court indicated in its ruling, but I think that communication between Rena Wood and Mr. Tenner were -- were items that he was ordered to produce at this deposition, and so I think I'm entitled to get copies of those.

**MR. MILLER:** And we'll produce copies after this is all kind of worked out between you two, between the parties.

**MR. LYONS:** Certainly understood.

**MR. MILLER:** But not until.

**MR. LYONS:** Let's go off the record for a second.

**THE VIDEOGRAPHER:** The time is

2:27 p.m. We're off the record.

(Discussion held off record.)

**THE VIDEOGRAPHER:** The time is 2:57 p.m. We're back on the record.

**MR. LYONS:** Mark that, please. It will be Plaintiff's Exhibit 2.

(Whereupon, Plaintiff's Exhibit No. 2 was marked for identification by the reporter and is attached hereto.)

**MR. DARVISH:** This is the one -- I've been wondering.

**BY MR. LYONS:**

Q. Mr. Tennen, I've handed you what's been marked as Plaintiff's Exhibit No. 2. And this is a letter to you dated February 8, 2016, that was sent via UPS overnight mail.

Do you recognize that letter, sir?

A. I do.

Q. And did you receive this letter with a copy of the court order appointing an emergency temporary guardian of the estate in 2016?

A. I'm sorry. Would you repeat that question?

Q. Yes, sir.

Did you receive this letter with a copy

of the order appointing emergency temporary guardian of the estate in 2016, sir?

A. **I believe I did.**

Q. And as a result of this letter, Centennial Bank was appointed as guardian of the estate, and Centennial Bank was ordered to investigate the income and assets, and we asked you for an accounting for the funds which you were holding in regard to the rentals of the above apartments.

Do you see that, sir, in the bottom paragraph on page 1?

A. **Yes.**

Q. Did you produce that at that time, sir?

A. **I do not believe I did, no.**

Q. Did you talk to Ms. Rena Wood regarding that?

A. **I believe I forwarded this, or -- yes, I probably copied it and forwarded it on to them, to her and her attorney, I believe.**

Q. Do you recall speaking with Ms. Wood regarding that, sir?

A. **I don't recall specifically this particular document; however, it's possible I did. There were many of these coming my way; so --**

Q. Besides forwarding it, what else did

you do in regard to determining whether you needed to comply with this order, sir?

A. **I forwarded it to Rena and, I believe, her attorney and did what was told for me to do, I believe. It was to -- that they were going to communicate with you guys about it and they were to give me direction. I cannot recall specifically timeline-wise, but that would have been what the order was.**

Q. And they did not direct you to provide the information that was sought in the letter of February 8, 2016, marked as Plaintiff's Exhibit 2?

A. **At this time, no. No, I don't believe that's the case.**

Q. I don't see a copy of it; so we'll go ahead and mark this as Plaintiff's Exhibit 3.

(Whereupon, Plaintiff's Exhibit No. 3 was marked for identification by the reporter and is attached hereto.)

**THE WITNESS:** Actually, before you do that -- this is it.

**BY MR. LYONS:**

Q. Okay. Great. Looking at Defendant's Exhibit 6 and ask whether you recognize that, sir?

A. **Yes, sir, I do.**

Q. All right. Did you receive that letter, sir?

A. **Yes, I did.**

Q. What did you do when you received it?

A. **I forwarded it on to them.**

Q. When you say "them," tell me who "them" is?

A. **I'm sorry. I believe it was Rena Wood and her attorney.**

Q. Did you contact an attorney about it besides her attorney?

A. **At this time, no, I don't believe I did.**

Q. Did you comply with the order that was provided here?

A. **At the time, no, I don't believe I did. However, yeah, at this time, no, I initially got it.**

Q. And you've already seen the letter from Eric Nelson which was dated February 9, which was introduced as Defendant's Exhibit 9; is that correct, sir?

A. **That's correct.**

Q. And did you do anything different in regard to Exhibit 9, sir?

**MR. DARVISH:** Objection as to form.

**THE WITNESS:** I do not believe -- I mean, what I did was I forwarded all these correspondence for it.

**BY MR. LYONS:**

Q. Did you supply Mr. Nelson any documents, sir?

A. **I do not recall doing that, no.**

Q. Did you simply listen to whatever Rena Wood and her attorney told you to do?

**MR. MILLER:** Objection. Argumentative.

**MR. DARVISH:** Objection as to form.

**THE WITNESS:** That would have been the case. Yeah, I would have taken their direction.

**BY MR. LYONS:**

Q. And then we had a letter -- I'm sorry -- an e-mail dated February 16.

A. **February 1.**

Q. Yeah, I'm sorry. February 18. And in Defendant's Exhibit 7, that was your response to Mr. Baker's letter, wasn't it, sir?

A. **That is correct.**

Q. Did you have any other authority, other than what Ms. Wood and her attorney told you, in regard to the court order, sir?

**MR. MILLER:** Objection. Vague.

Def. Obj.

Obj. Def

Obj. Def

Obj Def

Obj DEF.

MR. DARVISH: Objection. Lacks foundation. Objection as to form.

THE WITNESS: Could you repeat the question.

BY MR. LYONS:

Q. Sure.

A. **I'm sorry.**

Q. Sure. In this letter you say:

"I have been explicitly instructed that all correspondence and requests must be sent through and granted by Rena Wood and her Attorney Coleman Taylor who I've cc'd on this e-mail."

A. **Correct.**

Q. (Reading):

"Coleman's contact number is 479.527.0006. Unfortunately, I do not have any authority to release documents without permission."

Is that correct?

A. **Yes.**

Q. (Reading):

"Please submit the request for documents to Coleman, and with

written permission, I am happy to help you."

Is that correct?

A. **Yes.**

Q. Was that your response?

A. **That was my response.**

Q. And did you consult with an attorney, sir, other than Mr. Coleman Taylor?

A. **No.**

Q. Did you have your own attorney look at that document, sir?

MR. MILLER: Objection. I -- I would object that's privileged communication.

MR. DARVISH: Objection by this --

MR. LYONS: I just asked whether he looked at it.

MR. MILLER: That's privileged as well.

MR. DARVISH: Yeah, that's privileged.

BY MR. LYONS:

Q. Did you meet with an attorney regarding your response set forth in Exhibit 7, sir?

A. **No.**

Q. Now, your obligation for both sets of apartments essentially are the same, sir?

MR. MILLER: Objection. Vague.

Obj Def.

Obj Def.

THE WITNESS: Yes.

BY MR. LYONS:

Q. Are there differences between your obligations for the Olive Street Apartments and the Sixth Street Apartments?

MR. DARVISH: Objection as to form.

THE WITNESS: Not specifically. There's -- there are nuances to both buildings that are different from one another, but as far as our management responsibilities are concerned, it would be both.

BY MR. LYONS:

Q. It would be the same?

A. **It would be the same for both.**

Q. Same for both. Thank you.

Is the percentage --

(Cell phone interruption and a telephonic hearing was held from 3:07 p.m. to 3:34 p.m.)

(Deposition proceedings resumed.)

MR. DARVISH: First time appearing in federal court in Arkansas.

MR. MILLER: That's kind of cool.

MR. DARVISH: It's -- I'm telling you, you got to move there. It's so much easier to practice law than it is here.

MR. MILLER: You can't imagine. You

get in your car, and you get to where you're going at the speed limit the whole way. It used to be with everything around here.

MR. LYONS: It is life.

Y'all got a problem, call me. I'll handle it on the phone.

MR. MILLER: Yeah, I had a search warrant thing. He's right.

THE WITNESS: You don't get that same attention in L.A., huh, from L.A. judges?

MR. DARVISH: Not even close. Ex-parte. Get out of here.

MR. MILLER: I've had judges invite that for discovery disputes and thing like that, but usually it isn't like that. It isn't like that.

MR. LYONS: This is still on the record, guys.

MR. MILLER: Oh, yes.

MR. LYONS: Why don't we go off record and take a five-minute break. Come back and get this done.

THE VIDEOGRAPHER: This marks the end of media 2 in the deposition of Paul Tennen. It is 3:36 p.m.

We're off the record.

(Recess taken.)
**THE VIDEOGRAPHER:** We are back on the record. The time is 3:50 p.m.
This marks the beginning of media three in the deposition of Paul Tennen.

EXAMINATION (RESUMED)
**BY MR. LYONS:**
Q. So the apartments on Sixth Street and the apartments on Olive Street have approximately the same number of apartments, sir?
**A. Yes, they do.**
Q. Is the total rent approximately the same?
**A. Give or take approximately, yes.**
Q. They are within a few blocks of each other. Is that correct, sir?
**A. That's correct.**
Q. The use -- did you see the appraisal when these were refinanced, sir?
**A. I don't think so, no.**
Q. Who is Jason Baker?
**A. "Jason Baker"?**
Q. Yes, sir.
**A. If my memory serves me, he's related to**

**Rena Wood.**
Q. Do you know how he is related to Rena Wood, sir?
**A. I do not know for sure how, but I know they have some relationship.**
Q. Who is Carissa Oldenberg, sir?
**A. Carissa Oldenberg is the daughter of Rena Wood.**
Q. And both of them get free rent at one of the sets of apartments. Is that correct, sir?
**A. Jason Baker, I believe, gets a rent -- free rent; however, Carissa Oldenberg gets rental compensation for her -- as a resident manager of the building. So it is -- yeah.**
Q. She also gets free phone -- Carissa Oldenberg also gets a free phone?
**A. She gets reimbursed for office supplies such as office reimbursement for cell phone and, I believe, Internet usage and other work-related per labor law.**
Q. Who is John Moore, sir?
**A. I believe John Moore is Rena's father.**
Q. And he gets reduced rent also; is that correct, sir?
**A. That's correct.**

Q. If an issue arises regarding the payment of an expense or reimbursement in regard to either the Sixth Street or the Olive Street Apartments, who makes the decision on that if you're not sure what to do?
**MR. MILLER:** Objection. Improper hypothetical. Vague.
You can answer if you understand the question.
**THE WITNESS:** Repeat again the question.
**BY MR. LYONS:**
Q. Sure. If an issue arises regarding a payment of an expense or a reimbursement and you're not sure what to do --
**A. I contact Rena Wood.**
Q. -- does Rena Wood make the final decision on those as far as you know, sir?
**A. She would, in my jurisdiction, yes. Sometimes I don't get the correspondence. So I have to make the judgment call on my own.**
Q. Now, you mentioned Title Pro 24-7. If you would, explain to me what that is, sir.
**A. It's an online title company resource for Fidelity National Title, which is a title firm.**

obj. Def.

**They have an online portal to access title records and information. They give a property profile cover sheet which gives the highlights of the building.**
**And then sometimes there are documents attached to those Web pages where you can access other documents such as loan documents and other public records.**
Q. You look there to determine the name of the owner to put on the Defendants Exhibits 1 and 2; is that correct, sir?
**A. That's correct.**
Q. But you didn't search any other documents to determine if title was in the name of a particular trust of the -- or a portion of the sub -- Stiny Trust or subtrust of the Stiny Trust; is that correct?
**MR. MILLER:** Objection as to form.
**THE WITNESS:** There -- there are documents that are attached as an attachment link that would red flag certain title records and loan records.
To my best knowledge, I cannot recall if I dug further beyond what it says, which is owner's name; and then it said, I believe, Stiny Trust; and then there's a semicolon and then like the full name of it.
And so I believe that the difference in

the naming of the ownership was simply just an error I made where it said Stiny Trust, and then on the other -- as I produced the other one, I noticed if you pull up the other address, it says the full name Elijah and Mary Stiny Trust; whereas, the Olive cover letter says Stiny Trust.

So that's the reason for the differential in the ownership maybe.

And if I may, sometimes there are title differences, you know. So subtleties. So that's why I went with what was on the profile naming as opposed to maybe digging further at the time.

Q. You mentioned that you had certain walkthroughs with Rena Wood after you took over the apartments. I realize you had one at the beginning, but I'm talking about after when you took over.

**A. That's correct.**

Q. Is that correct?

**A. Yes.**

Q. When you walked through with Rena Wood after the first time, these later walkthroughs, did you keep any records of those walkthroughs, sir?

**A. I don't recall if I wrote any notes down or if we made any record of it. I can't recall right now.**

Q. If you have any records, will you produce those, sir?

**A. Absolutely.**

Q. And this would -- I realize you don't remember, but what was the point of having this walkthrough or these walkthroughs?

**A. Generally, she was in town. While she was in town, we would do them, like I said, maybe once or twice or three times; but during the time she was here, we did a couple of walks to get familiar with the buildings.**

**Once she relocated or moved or whatever it was, she said she would come into town, and she would walk the buildings, and so we would just check them out, you know, as we do with a lot of the owners in a lot of these buildings. We walk with them. We notice things. They'll give me some direction: paint the top, fix the soffit, such and such. So that was pretty much the basis for the meetings.**

Q. Had Ms. Rena Wood been in charge of the apartments before April of 2013?

**A. I believe she was. I don't know the specifics because I wasn't involved with her at that time, but I believe, given what she knew about the buildings and the process and things, I believe she had**

**some familiarity or involvement in some capacity.**

**MR. MILLER:** I would object that that question calls for speculation. Belated objection.

**BY MR. LYONS:**

Q. You were asked during Mr. Darvish's questioning whether Ms. Wood signed any checks. And you said you didn't believe she did.

What type of checks would she have signed if there were any?

Obj. Def

**MR. MILLER:** Objection. Improper hypothetical.

**MR. DARVISH:** Objection as to form.

**MR. MILLER:** It calls for speculation.

**THE WITNESS:** With regards to our operation, she didn't sign any checks. If she chose to buy things or do things on her own, that was her prerogative.

Obj. Def

With regards to the management of the buildings, the accounts are labeled in our name as in trust -- trust accounts for the reason that we are responsible for the monies that go in and out, and we are -- have an accounting for all of that. So in that sense, she would have had jurisdiction to write checks in that sense.

**BY MR. LYONS:**

Q. Let me show you what was marked as Exhibit 5 during your direct examination letter from Mark Johnson regarding him representing Helen Robins.

Did you respond to Mark Johnson, sir?

**A. I don't believe I did. I don't believe I did.**

Q. Mr. Darvish asked you about sending the monthly statements out, and you said you thought you were sending them to Ms. Wood only at this time. But in fact, you were sending a copy to us; is that correct?

**MR. MILLER:** Objection. Vague as to time.

**THE WITNESS:** I confirmed, that since the court order, that I had been sending them to all parties that I've been asked to send them to.

**MR. DARVISH:** Objection as to form. Which court order?

**BY MR. LYONS:**

Q. Which court order are you referring to?

**A. The one that instructed me to distribute funds and also submit paperwork to the courts and to a laundry list of people on e-mail that I send it to. Sorry. I don't have it in front of me. So I'm sorry.**

Q. That's fine.

Page 122

That order came from Judge Marshall who we spoke with; correct?
A. **Okay. Yeah. Yes.**
Q. Did you ever do anything to determine whether Eric Nelson was named as a successor trustee prior to Rena Wood?
**MR. DARVISH:** Objection as to form.
**THE WITNESS:** Did I do anything else? The correspondence that I received from Eric Nelson and from everybody else involved here was forwarded to Rena Wood and her counsel for direction. And I believe if I -- if memory serves me, the only response I gave was to Steve Baker from the bank letting him know that I cannot distribute these documents without permission, and then that -- that was about the fifth -- yeah. Yeah. And --
**BY MR. LYONS:**
Q. And you were told not to send these documents by Ms. Rena Wood; correct, sir?
A. **Her counsel had said that they would reach out and confirm and not to send anything until they get any, you know, further clarification or guidance.**
Q. Did Ms. Wood ever say it was acceptable to send documents to anyone other than to her counsel?

Page 123

A. **Initially, Rena told me to -- she's the one who gave me the address for Ms. Mary Stiny, and she was aware that I was sending reports monthly to that address.**
Q. But you stopped that; is that correct, sir?
A. **Yes.**
Q. And after you stopped that, have you ever started sending them to Ms. Stiny again?
A. **No.**
Q. Why did you stop sending those to Ms. Stiny?
A. **I cannot recall specifically why. I just cannot. I don't know why I -- yeah.**
Q. When you say you contracted Ms. Wood and her attorney, did you specifically contact Coleman Taylor; or did you contact Ms. Wood? How was that done, sir?
A. **I would say most likely via e-mail, correspondence and/or phone call.**
Q. Would you contact Mr. Coleman Taylor directly by phone call, or would you contact Rena Wood, sir?
A. **I can't recall if I specifically -- if I called Coleman Taylor directly. I know that we had**

Page 124

**correspondence. I just cannot remember if I had reached out to him via phone call or if that was based on the e-mail.**
Q. Did you ever call Eric Nelson and offer to meet him as he mentioned in his letter?
A. **In coming to my office?**
Q. Yes.
A. **I don't recall inviting him to a meeting to come to my office.**
**MR. LYONS:** Pass the witness.
**MR. DARVISH:** Let's take -- can we go off the record.
**THE VIDEOGRAPHER:** The time is 4:08 p.m. We're off the record.
(Discussion held off record.)
**THE VIDEOGRAPHER:** The time is 4:12. We're back on the record.

**EXAMINATION**

**BY MR. DARVISH:**
Q. So we're back on the record. I wanted to ask you some followup questions that you were asked earlier by Mr. Lyons.
I am handing you right now Volume I of Linder & Associates' financial statement from '13 to

Page 125

2015.
Can you take a look at this document -- this binder for me.
A. **Uh-huh.**
Q. You were shown three binders about that size; correct?
A. **That is correct.**
Q. All right. And you were asked to review the documents and authenticate the documents prior to coming back on the record; correct?
A. **That is correct.**
Q. All right. Did you review every single page of these documents in order --
A. **I did not.**
Q. -- to determine whether or not they are the true and accurate -- true and accurate reflection of the documents that you actually -- you produced?
A. **I did not.**
Q. Did you crosscheck to any of these documents to the originals that you have in your office?
A. **I did not.**
Q. You did not produce these documents today; correct?
A. **Correct.**
Q. Did you produce any documents today?

A. I did not.
Q. How do you know that the numbers that are on those statements right there are true and accurate?
A. I do not.
Q. Would it be possible that these are or are not -- strike that.
Would it be -- so when you originally testified that these look like your statements that you had sent out on a monthly basis, there is no way for you to tell me today as to whether or not these are the true and accurate statements that were sent out?
A. That's correct.
Q. You earlier testified that you stopped sending checks to Rena at some point because of the dispute that had arisen.
A. Correct.
Q. Did Rena tell you to stop sending any money out?
A. She did.
Q. Okay. Just curious. Do you know the difference between a guardian and a trustee?
**MR. MILLER:** Objection. Calls for legal opinion.
If he knows.

**BY MR. DARVISH:**
Q. If you know, answer.
**MR. LYONS:** Same objection.
**THE WITNESS:** I -- I can't speak to that. I do not know for sure.
**BY MR. DARVISH:**
Q. All right. When you originally took over the management of the buildings, you spoke to Rena; correct? And she provided you the keys, as you earlier testified, or knew the manager who had the keys; is that correct?
**MR. MILLER:** You have to say "yes" --
**THE WITNESS:** Yes, I'm sorry. Yes, I was waiting for you to finish. Yes, that's correct.
**BY MR. DARVISH:**
Q. Was there any reason to believe that she was not actually participating in managing those buildings?
A. I had no reason to believe that.
Q. Did she have access to the accounts that the money was going into, to your knowledge?
A. Prior -- yes, she did.
Q. Did she help transfer all the documents and leases to Linder & Associates?
A. She assisted in that, yes.

Q. She assisted in that?
A. Yes. Some of that was on-site with the resident manager and so forth.
Q. And the resident -- and the manager knew her; correct?
A. Yes, that's correct.
**MR. DARVISH:** I have no further questions.
**MR. LYONS:** Let's go off the record for a second.
Do you want --
**THE VIDEOGRAPHER:** Standby.
The time is 4:16. We're off the record.
(Discussion held off record.)
**THE VIDEOGRAPHER:** The time is 4:22. We're back on the record.
**MR. LYONS:** First, I believe that we have an agreement that Mr. Tennen will read and sign his deposition, and we'll produce any errata sheet and signature within seven days of receipt of that deposition; is that correct?
**MR. MILLER:** That's correct.
**MR. LYONS:** Is that correct?
**MR. DARVISH:** That's correct.

**MR. LYONS:** Okay. And then we have a stipulation that Mr. Tennen will also produce all of the documents beginning in April of 2013 up through whatever the present date is, as of the date of production of all financial statements for both sets of apartments being the Olive Street Apartments and the Sixth Street Apartment, and he will produce them either by Dropbox or by flash drive, and we'll execute a document to the effect -- under oath to the effect that this is a true an correct set of the documents from April of 2013 up to the date they're produced, and that I agree that those may be admitted and used at trial subject to objections to relevance that they are properly authenticated.
Do you agree, Mr. Darvish, that those will be properly authenticated?
**MR. DARVISH:** The financial documents with regard to the ones that he will produce, yes.
**MR. LYONS:** Okay. Do you have any objection?
**MR. MILLER:** I have no objection what we will produce.
**MR. LYONS:** Okay.
**MR. DARVISH:** So we're clear on the record, the stipulation is with only the financial records, not with the documents that are the additional

Obj. Def.

documents that he is going to produce?

MR. MILLER: Correct. Only the monthly financial documents that were previously reviewed.

MR. DARVISH: Correct.

MR. LYONS: Right, that's correct.

MR. DARVISH: Okay. Now I stipulate to relieve the court reporter of his -- her duties under the code;

And that she will prepare a transcript, and it will be produced to you, and you will have seven days within which to review and sign back of any changes;

If you do not make any changes, then the original may be used -- or a copy thereof may be used at trail;

And the purpose of this deposition is in lieu of your live testimony in federal court in Arkansas.

Did I miss anything else with the stipulation?

So stipulated.

MR. LYONS: So stipulated.

MR. MILLER: So stipulated.

THE VIDEOGRAPHER: This concludes the deposition of Paul Tenner. Total number of media used

was three.

We're going off the record. The time is 4:25 p.m.

(Discussion held off record.)

(Proceedings resumed without videotape.)

MR. MILLER: If the original is lost or destroyed, a certified copy may be used for any purpose, including at trial.

MR. DARVISH: Exactly.

MR. LYONS: Absolutely.

(The proceedings concluded at 4:26 p.m.)

PENALTY OF PERJURY CERTIFICATE

I hereby declare I am the witness in the within matter, that I have read the foregoing transcript and know the contents thereof; that I declare that the same is true to my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare being aware of the penalties of perjury that the foregoing answers are true and correct.

Executed on the _____ day of _______________, _____,
at ______________________________, ____________________________.
(CITY) (STATE)

______________________________
PAUL TENNEN

STATE OF CALIFORNIA )
) ss:
COUNTY OF LOS ANGELES )

I, KIMBERLY M. LOWE, do hereby certify:

That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of certificate number 12529, which is in full force and effect and that I am authorized to administer oaths and affirmations;

That the foregoing deposition testimony of the herein named witness was taken before me at the time and place herein set forth;

That prior to being examined, the witness named in the foregoing deposition, was duly sworn or affirmed by me, to testify the truth, the whole truth, and nothing but the truth;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;

That the foregoing pages contain a full, true, and accurate record of the proceedings and testimony to the best of my skill and ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties,


Page 134

nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action,

IN WITNESS WHEREOF, I have subscribed my name this 5TH day of November 2018.

KIMBERLY M. LOWE, CSR NO. 12529

Page 135

ERRATA SHEET

If any corrections to your deposition are necessary, indicate them on this sheet, giving the change, page number, Line number and reason for change.

PAGE Line FROM TO

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

____ ____ ________________ ________________

Reason ________________________________

________________ ________________
Signature of Deponent Date